CRANE COMPANY, Plaintiff-Appellant,

v.

WESTINGHOUSE AIR BRAKE COMPANY, A. King McCord, Edward J. Janley, Edwin Hodge, Jr., Frank L. Magee, John A. Mayer, G. Albert Showmaker, Eric A. Walker, Lawrence E. Walkley, Jay V. Wilcox and Leslie B. Worthington, Defendants-Appellees.

CRANE COMPANY, Plaintiff-Appellant,

v.

AMERICAN STANDARD, INC. and Blyth & Co., Defendants-Appellees.

Nos. 435–438, Dockets 32569–32572.

United States Court of Appeals Second Circuit.

Argued March 7, 1969.

Decided Dec. 10, 1969.

John W. Castles, III, New York City (Lord, Day & Lord, Wendell Davis, Jr., Roger C. Ravel, New York City, of counsel), and Abraham L. Pomerantz, New

York City (Pomerantz, Levy, Haudek & Block, New York City), for plaintiff-appellant.

George C. Kern, Jr., New York City (Sullivan & Cromwell, Edward W. Keane, New York City, of counsel), for appellees American Standard, Inc. and Blyth & Co., Inc.

John W. Barnum, New York City (Cravath, Swaine & Moore, Donald I. Strauber, New York City, of counsel), for the individual appellees.

Before LUMBARD, Chief Judge, and SMITH and KAUFMAN, Circuit Judges.

### J. JOSEPH SMITH, Circuit Judge:

This is an appeal by Crane Company from a decision of the United States District Court for the Southern District of New York, Sylvester J. Ryan, Judge, entered June 5, 1968, dismissing, after trial on the merits, Crane's consolidated complaint which was brought to prevent the consummation of the proposed merger of Westinghouse Air Brake Company ("Air Brake") into American Standard, Inc. ("Standard"). We find error in part and reverse and remand for further proceedings consistent with this opinion.

In the first action of the two later consolidated, Crane sought to enjoin appellees from giving effect to proxies solicited by Air Brake from its shareholders in support of a proposed merger of Air Brake into Standard. The suit was founded on claimed misrepresentation of Standard's earnings, and on allegedly false and misleading statements of other facts in violation of sections 10 [1] and 14 [2] of the Securities Exchange Act of 1934 and Rules 14a-9 [3] and 10b-5.[4]

Crane's second action, which was consolidated with the first action for all purposes, was instituted against Standard and Blyth & Company, Inc. ("Blyth") under sections 9,[5] 10 and 14 of the Exchange Act and Rules 10b-6 [6] and 10b-5 and Regulation 14A,[7] the proxy rules, alleging that Blyth on Standard's behalf manipulated and rigged the price of Air Brake stock on the New York Stock Exchange at the expense of the merged entity for the purpose of deterring tenders of Air Brake stock under a Crane exchange offer.

### THE FACTUAL BACKGROUND

Crane first proposed a merger of Crane and Air Brake to the Air Brake management on May 15, 1967. Crane thereafter first began substantial purchases of Air Brake stock on June 15, 1967. This was noticed by Air Brake's management.

On September 27, 1967, Air Brake received from A. T. Kearney & Company, Inc., independent management consultants, a report which concluded that there was no material compatibility of products between the Air Brake and Crane product lines. On November 3, 1967, Air Brake informed Crane that it did not wish to pursue any merger discussion with Crane.

By that time a beneficial owner of nearly 10 percent of Air Brake's outstanding stock, Crane embarked on a systematic program of purchasing Air Brake shares, despite the November 3 rebuff. Air Brake's management, desiring to prevent Crane from obtaining representation on Air Brake's board of directors, on December 7, 1967, changed the Air Brake by-laws to increase the minimum cumulative vote necessary to obtain representation on the board from 9.1 percent to 25 percent.

In mid-December, 1967, Air Brake requested Kearney & Company to analyze Crane's performance. Shortly thereafter, Mr. Devlin, chairman of Blyth & Company, investment bankers and representative of Standard, proposed to A.

---

1. 15 U.S.C. § 78j.

2. 15 U.S.C. § 78n.

3. 17 C.F.R. § 240.14a-9.

4. 17 C.F.R. § 240.10b-5.

5. 15 U.S.C. § 78i.

6. 17 C.F.R. § 240.10b-6.

7. 17 C.F.R. § 240.14a-1 et seq.

King McCord, chairman of Air Brake, that Standard would be interested in helping Air Brake resist the Crane takeover attempt. The Kearney report of January 15, 1968, analyzed the profits of both Crane and its largest competitor, Standard, and concluded that the trend of their earnings and profits was similar, and that the plumbing industry was less dynamic than the industry participated in by Air Brake.

On February 20, 1968, Crane filed its 14–B statements with the SEC declaring its intention to solicit proxies to elect directors to the Air Brake board. Air Brake immediately learned of this. On the same day McCord met with several of the Air Brake directors, and discussed the February 19 proposal of Blyth & Company to merge Air Brake into Standard by exchanging Air Brake stock for a Standard security worth approximately $50 per share. Air Brake's stock was then quoted at about $36 per share.

On March 4, 1968, seven of the ten Air Brake directors met in special session and agreed on the merger of Air Brake into Standard, substantially on the terms which McCord had reached in negotiations with representatives of Standard on March 1, 1968. On March 5 Air Brake informed its shareholders of the terms of the agreement and its approval thereof. Air Brake stock rose to $44 on the New York Stock Exchange.

During the week of April 8, 1968, Crane mailed to Air Brake stockholders its offer to exchange Crane stock and debentures totalling $50 in face amount for each share of Air Brake stock, the offer to expire on April 19 at 5:00 p. m., unless extended. During the same week, Air Brake mailed its proxy statement dated April 8 soliciting proxies in favor of the proposed Standard merger. On April 10, Air Brake stock was selling at about $49. During this week, Standard's purchases of Air Brake shares were substantial. On April 19, the day Crane's tender offer was to expire, Standard purchased 170,000 shares of Air Brake on the New York Stock Exchange at an average cost of $49.50 per share, and sold 100,000 shares off the market to Investors Diversified Services ("IDS") and 20,000 shares on the market at a negotiated price to Dillon Read at an average price of $44.50 per share, taking an apparent loss of more than $500,000 on its purchases and sales for the day.

Crane continued to accumulate Air Brake stock. By mid-April, Crane held about 15 percent of Air Brake's stock, 25 percent by the time of trial, and had increased its holdings to about 32 percent by the end of May, 1968.

The special meeting of Air Brake stockholders was convened on May 16, 1968. The proxy count ran heavily in favor of the Air Brake-Standard merger, 2,903,869 to 1,180,298, very few shares of Air Brake not owned by Crane itself being voted against the merger.

The trial in the District Court began on May 21, 1968, and continued for two weeks until June 3. Judge Ryan read his opinion into the record, and the court entered judgment dismissing the consolidated complaint on the merits on June 5, 1968. The merger became effective on June 7, 1968, upon which the former Air Brake stock was converted into shares of a new issue of Standard convertible preferred. Crane's 32 percent stock interest was converted into 740,311 shares of this preferred stock. On June 13, 1968, under threat of a divestiture action to be brought by Standard under the antitrust laws, Crane sold all but 10,000 of its shares of Standard, at a profit of several million dollars, and later disposed of all but 1,000 of the remaining shares.

## STANDARD'S STOCK TRANSACTIONS

Crane attacked Standard's transactions in Air Brake stock on two grounds, one as illegal purchases of votes or proxies, the other as market manipulation and fraud in connection with the purchase and sale of securities. The first attack was pressed most vigorously below but was properly disposed of as unsupported in the evidence and is no longer pressed here.

Perhaps because of the pressure of circumstances and the heavy emphasis on the vote buying claim, the court denied relief with no extensive treatment of the market manipulation and fraud claims involving sections 9(a) (2) and 10(b) of the Act. Consideration of these claims in the light of undisputed evidence in the case leads us to a result contrary to that reached by the District Court.

## MARKET MANIPULATION AND DECEPTION

█ While the main thrust of Crane's case below was in support of the claims of deceptive proxy statement and illegal vote buying, it also vigorously attacked Standard's market activities as forbidden manipulation and fraud in connection with the purchase and sale of securities. The record plainly supports this claim that Standard violated sections 9(a) (2) and 10(b) of the Exchange Act.

In the District Court, Crane maintained that Standard had been buying or selling Air Brake stock conditioned upon the granting or reservation of voting rights. The court found this claim unsupported.[8] Although Crane also alleged that Standard manipulated and inflated the market price of Air Brake with a view to frustrating the Crane tender offer, the District Court summarily rejected this claim.[9]

The facts surrounding the manipulation of Air Brake stock by Standard are substantially free from dispute. The critical day in the take-over battle was April 19, the day Crane's tender offer for Air Brake stock was to expire. The holders of Air Brake stock could be expected to delay until the last moment in order to make a decision based on the latest market information, i. e., to compare the value of the tender offer, here not more than $50, with the market price on the day the offer was to expire. In fact, 85 percent of the shares tendered to Crane by the 19th were offered on that day. See Schmultz and Kelley, Cash Take-Over Bids—Defense Tactics, 23 Bus.Lawyer 115, 124 (1967). On April 19, Air Brake opened at 45¼ on the New York Stock Exchange, giving Crane's tender offer a good prospect of success. The surest way to defeat the Crane offer was to run the price up to $50. The tape did quickly reach $50 on April 19, and Crane's tender offer failed. Crane's claim that this was the result of extraordinary transactions by Standard is supported by the record.

At the close of trading on the 18th, Standard's net accumulation of Air Brake totalled 367,000 shares. Standard had a self-imposed limit of 460,000 shares, or 10 percent of Air Brake's outstanding stock, allegedly to avoid problems of pooling-of-interest accounting treatment and liability under section 16 (b) of the Exchange Act. Only 92,600 shares remained to be purchased to reach Standard's self-imposed limit. On Friday, the 19th, Standard proceeded to purchase in a series of transactions, ranging in size from 100 to 9700 shares, a total of 170,200 Air Brake shares, at an average price of $49.08 per share, and a total price of approximately $8.4 million. The net result of this buying was to represent to the public, whose primary source of information is the tape, that

8. "I find there is no proof that American Standard has been buying or selling Air Brake stock conditioned upon the granting or reservation of voting rights. The fact that American Standard bought shares of Air Brake in order to vote in favor of the merger and that it sold to persons whom it hoped would vote in. favor of the merger either to obtain money to purchase stock or to keep its holdings below a 10 percent control interest does not constitute a purchase of votes independent of the stock to which the votes belong."

9. "In the same way, assuming American Standard, through Blyth & Company, was actively engaged in acquiring Air Brake stock solely, as I have noted, in order to vote it in favor of the merger, I find nothing illegal about it. This was the very thing that plaintiff Crane was lawfully doing when it made its tender in order to oppose the merger."

there was a great demand for Air Brake at an increased value. It is reasonable to conclude that many Air Brake stockholders who might otherwise have chosen to tender to Crane chose not to do so because their own holdings in Air Brake looked better as the price went up.

The fact was, however, that not only was Standard creating this extraordinary demand for Air Brake stock, but only 50,000 of the 170,000 shares represented an actual increase in Standard's holding in Air Brake. Before the opening of the market on Friday, Mr. Ledbetter of IDS agreed to purchase from Standard 100,000 shares of Air Brake at $44½. This transaction did not affect the dramatic 5 point climb of the "tape" price of Air Brake since Standard made no public announcement of the private sale. The sale to IDS was secret; Standard's telegram to IDS confirming the sale was marked "HIGHLY CONFIDENTIAL." Shortly after the opening Standard sold another 20,000 Air Brake shares to Dillon Read at 44⅞, at the same time that it was buying on the exchange. At the close of trading on Friday the 19th, Standard held a total of 417,000 Air Brake shares. It had sold 120,000 shares at a price of just above $44½, and purchased 170,000 shares at an average price of $49.08, for a net trading loss exceeding one-half million dollars. Standard had "painted the tape" in Air Brake stock. It appears that of the 26,300 shares of Air Brake traded at 50 that day, all but 100 were bought by Standard. This course of conduct was certain to raise the price of Air Brake stock suddenly and dramatically.

Standard's extraordinary buying here, coupled with its large secret sales off the market, inevitably distorted the market picture and deceived public investors, particularly the Air Brake shareholders. The effect of these purchases was to create the appearance of an extraordinary demand for Air Brake stock and a dramatic rise in market price, as a result of which Air Brake shareholders were deterred from tendering to Crane. Concentrated open market bidding in a takeover battle may not in itself violate present laws and regulations, a question we do not decide here. Standard's action here, however, in concealing from the public—and in particular from the Air Brake stockholders—the true situation as to the market it was making in Air Brake stock resulted in violations of sections 9(a) (2) and 10(b) of the Act.

The entire corporate take-over problem, mushrooming in recent years, is properly engaging the attention of the Congress and the Commission. See Schmultz and Kelley, *op. cit. supra* at 115 n. 2. See also Public Law 90–439, § 3, 82 Stat. 455 (1968). In the meantime, we must apply to the devices, new and old, used in these battles the protections contained in legislation existing at the dates of the actions in suit.

We must determine the application of sections 9(a) (2) and 10(b) to the relatively new device of the tender offer, rarely used before 1965, and to the methods here used to combat it. See Hayes and Taussig, Tactics of Cash Take Over Bids, 45 Harv.Bus.Rev.No.2 135 (March-April 1967). Manipulative schemes may not be allowed to succeed solely because they are novel. A. T. Brod & Co. v. Perlow, 375 F.2d 393 (2d Cir. 1967). The Act was designed "[t]o provide for the regulation of securities exchanges and of over-the-counter markets * * * [and] to prevent inequitable and unfair practices on such exchanges and markets, * * * *." 48 Stat. 881; see 15 U.S.C. § 78b. As this court emphasized in SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 858, 860 (2d Cir. 1968), cert. denied *sub nom.* Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), the purpose of the Act was to "protect the investing public," to "promote free and open public securities markets" and to "secure fair dealing in the securities markets." These statutory objectives require the granting of relief in this case.

Section 9(a) (2), 15 U.S.C. § 78i(a) (2) makes it unlawful:

> To effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

Liability for a violation of section 9(a) (2) is provided by section 9(e):

> Any person who wilfully participates in any act or transaction in violation of subsections (a), (b), or (c) of this section, shall be liable to any person who shall purchase or sell any security at a price which was affected by such act or transaction, and the person so injured may sue in law or in equity in any court of competent jurisdiction to recover the damages sustained as a result of any such act or transaction.

Section 9(a) (2) was considered to be "the very heart of the act" and its purpose was to outlaw every device "used to persuade the public that activity in a security is the reflection of a genuine demand instead of a mirage." 3 Loss, Securities Regulation 1549–55 (2d ed. 1961).

■ Sections 9(a) (2) and 9(e) contain requirements of both manipulative motive and willfulness. The section does not condemn extensive buying or buying which raises the price of a security in itself. Nor are the requirements of manipulative purpose and willfulness to be interpreted apart from the statute's design to prevent those with a financial interest in a security from manipulating the market therein. The requisite purpose and willfulness is normally inferred from the circumstances of the case. In the Matter of Halsey, Stuart & Co., 30 SEC 106, 123–124 (1949); cf. United States v. Minuse, 114 F.2d 36 (2d Cir. 1940).

■ It is clear that Crane was one of the class of persons intended to be protected by the statute against Standard's violation. Standard acted for the "purpose of inducing" sale by Crane. Standard's actions had the intended and inevitable effect of inducing Crane to become a seller within the meaning of section 9(a) (2), for if successful in defeating Crane's tender offer and consummating the Standard merger, antitrust considerations would require sale by Crane of the shares held by Crane or those received in exchange. This placed Crane in a situation comparable to that of the dissenting shareholders in Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir. 1967), cert. denied 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1968) for here, as there, plaintiff was forced to become "a seller under the Act."

■ Section 9(a) (2) was aimed at preventing an individual from dominating the market in a stock for the purpose of conducting a one-sided market at an artificial level for its own benefit and to the detriment of the investing public. See Note, Manipulation of the Stock Markets Under the Securities Laws, 99 U.Pa.L.Rev. 651 (1951); Note, Regulation of Stock Market Manipulation, 56 Yale L.J. 509 (1947). See also the House Report on the Exchange Act:

> To insure to the multitude of investors the maintenance of fair and honest markets, manipulative practices of all kinds on national exchanges are banned. The bill seeks to give to investors markets where prices may be established by the free and honest balancing of investment demand with investment supply. * * * [T]he most subtle manipulating device employed in the security markets * * * is the conscious marking up of prices to make investors believe that there is a constantly increasing demand for stocks at higher prices. * * * Legitimate investors desire to buy at as low a price as possible and to sell at as high a price as possible, and honest markets are made by the balancing of investment demand and investment supply.

H.R.Rep.No.1383, 73d Cong., 2d Sess. (1934) at 11.

■ When a person who has a "substantial, direct pecuniary interest in the success of a proposed offering takes active steps to effect a rise in the market" in the security, we think that a finding of manipulative purpose is prima facie established.[10] Here we have even more than a motive to manipulate joined with the requisite series of transactions. In furtherance of its interest in defeating the Crane tender offer and consummating its own merger with Air Brake, Standard took affirmative steps to conceal from the public its own secret sales off the market at the same time it was dominating trading in Air Brake shares at a price level calculated to deter Air Brake shareholders from tendering to Crane.

Standard's argument that it had only the purpose to acquire shares of Air Brake looking toward control and not to manipulate is unconvincing. Standard's massive buying on April 19, coupled with its concealed sales, was not consistent with the normal desire of an investor "to buy at as low a price as possible." H.R. Rep.No.1383, *supra*, at 11. Neither Crane nor Standard were normal investors. Standard knew that it could not acquire 120,000 shares of Air Brake on one day's trading for immediate delivery without paying a substantial premium for the stock. In the week prior to April 10, Standard had in fact purchased 16,500 shares at an average price of $43.38 per share. Knowing that running up the price of Air Brake stock on April 19 would discourage acceptance of the Crane offer, Standard's extraordinary purchases and simultaneous sales on April 19 cannot be explained solely by an alleged "purpose" to acquire voting control consistent with the scope and design of section 9(a) (2). Cf. White & Weld, 3 SEC 466, 505 (1938).

■ An ordinary investor watching the tape could only conclude that there was a wide-based demand for Air Brake stock and that it would be unprofitable to tender his stock to Crane at that time. See SEC v. Torr, *supra* n. 10; Halsey, Stuart & Co., *supra*. Not only did Standard fail to provide Air Brake shareholders with the information that it planned or was in fact purchasing large amounts of Air Brake stock at a price which made the Crane offer look unappealing on the crucial expiration date, but it further distorted their only ready source of market information—the stock tape—by secret private sales off the stock exchange. As Judge Ryan himself put it, "The securities laws are concerned with the facts presented to the stockholders, not with the motives underlying these facts." See Heit v. Weitzen, 402 F.2d 909, 913 (2d Cir. 1968), cert. denied 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969); SEC v. Texas Gulf Sulphur Co., *supra,* at 401 F.2d 861.

From the foregoing, it is also clear that Standard has violated section 10(b) of the Exchange Act, and Rule 10b-5, 17 C.F.R. 240.10b-5, pursuant to section 10(b) of the Exchange Act, which provides as follows:

It shall be unlawful for any person, * * * by use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

 (1) to employ any device, scheme, or artifice to defraud,

 (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made not misleading, or

 (3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

Standard's failure to disclose its manipulation operated as a fraud or deceit

10. 3 Loss, Securities Regulation 1552–53 (2d ed. 1961); Federal Corp., 25 SEC 227, 230 (1947); see SEC v. Torr, 22 F.Supp. 602 (S.D.N.Y.1938).

on Crane in connection with the purchase and sale of securities, creating a right to relief in Crane quite apart from Crane's rights as a forced seller under section 9(a) (2).

The nondisclosure rule is based "in policy on the justifiable expectation of the securities marketplace that all investors trading on impersonal exchanges have relatively equal access to material information * * *. The essence of the Rule is that anyone who, trading for his own account in the securities of a corporation has 'access, directly or indirectly, to information intended to be available only for a corporate purpose * * *' may not take 'advantage of such information knowing it is unavailable to those with whom he is dealing,' i. e., the investing public." SEC v. Texas Gulf Sulphur Co., supra, at 401 F.2d 848 (citations omitted).

█ Standard was an "insider" with respect to the trading of Air Brake stock. Standard was acting in concert with the Air Brake management, with whom it was on the verge of consummating a merger. Standard regularly and systematically informed the Air Brake management of its transactions in Air Brake's stock. Finally, Standard was a major stockholder of Air Brake, and its purchases were within its peculiar knowledge and were an integral part of the takeover scheme.

█ When securities are subject to trading dominated by an insider such as Standard, there is an obligation to disclose material information to the investing public, and this duty gives rise to liability under 10b–5 to third persons who, as a result of the deception practiced upon the public, are prevented from entering into securities transactions with members of the public. When Crane entered the securities market with its tender offer, it was entitled to the Act's protection not only against being deceived itself but also against deception of the investing public designed to prevent the public from entering into securities transactions. See SEC v. Texas Gulf Sulphur Co., 258 F.Supp. 262, 279 (S.D.N.Y.1966) and supra, at 401 F.2d 848.

The inherent unfairness and deception practiced by Standard is readily apparent. The proxy regulations do not protect the investing public against all types of manipulative devices. Although information concerning the terms and purposes of the tender offer are provided by the offeror, the "investors' primary yardstick for evaluating the offer is the market performance, past and present, of the security he holds and the one he is offered, if any." Bromberg, Securities Laws: Fraud—SEC Rule 10b–5 § 6.1, p. 111 (1969). In the present case, the market information itself was misleading. If Air Brake's stockholders were aware of Standard's plans and actions on April 19, they would have been able to place the trading in perspective and would not have been misled by the superheated trading of Air Brake on the New York Stock Exchange. Standard's extraordinary buying on April 19, coupled with its large secret sales off the market distorted the market picture and deceived the Air Brake stockholders.[11] From the foregoing it is also clear that the undisclosed information was material. Standard's secret sales to IDS and Dillon Read and its purchasing tactics were facts to which a "reasonable man would attach importance * * * in determining his choice of action in the transaction in question." List v. Fashion Park, Inc., 340 F.2d 457, 462 (2d Cir. 1965), cert. denied 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); SEC

11. This is not necessarily a double violation of 10b–5—i. e., once in the manipulation and again in its nondisclosure. Standard's transactions were manipulative, and it concealed material information, the violation of 10b–5 consisting of nondisclosure of the manipulation. Compare Thornton & Co., 28 SEC 208, 224 (1948), aff'd sub nom. Thornton v. SEC, 171 F.2d 702 (2d Cir. 1948); Adams & Co., 33 SEC 444 (1952); Surowitz v. Hilton Hotels, 342 F.2d 596 (7 Cir. 1965), rev'd and remanded 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966).

v. Texas Gulf Sulphur Co., *supra,* at 401 F.2d 849–852.

 Since the violation in this aspect is not manipulation but failure to disclose the trading scheme, the question arises as to whether Crane is a proper party to raise the issue since it did not rely on the nondisclosure. Although we have held that reliance was necessary under 10b–5, List v. Fashion Park, Inc., *supra,* at 340 F.2d 463, reliance is an element of causation which plays little role in nondisclosure cases. As we pointed out in *List,* "the test of 'reliance' is whether 'the misrepresentation is a substantial factor in determining the course of conduct which results in [the plaintiff's] loss.' * * * The reason for this requirement * * * is to certify that the conduct of the defendant actually caused the plaintiff's injury," since a "basic * * * element of tort law" is "the principle of causation in fact." 340 F.2d at 462, 463. We have held that where the success of a fraud does not require an exercise of volition by the plaintiff, but instead requires an exercise of volition by other persons, there need be no showing that the plaintiff himself relied upon the deception. "What must be shown is that there was deception which misled [other] stockholders and that this was in fact the cause of plaintiff's claimed injury." Vine v. Beneficial Finance Co., *supra,* 374 F.2d at 635. Standard's deception caused injury to Crane. Crane's tender offer could only be successful if its value to investors was attractive in comparison with the indicated value of Air Brake on the New York Stock Exchange. The extent of the damage will have to be determined by the District Court, in fashioning an appropriate remedy, and the burden of proof thereon will be on Crane. It is sufficient that the causation requirement is satisfied here to the extent of imposing liability upon Standard for the consequences of concealing from the public material information relevant to the market value of Air Brake stock in a free market.

The standing issue arises in another context with respect to the purchaser-seller limitation, which arises from the language of both section 9(a) (2) and Rule 10b–5. Section 9(a) (2) prohibits manipulation "for the purpose of inducing the purchase or sale of such security by others," while Rule 10b–5 similarly prohibits deception upon "any person in connection with the purchase or sale of any security."

Although this court adhered to a fairly strict construction of the purchaser-seller requirement in Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), and in Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963 (2d Cir., Nov. 3, 1969), there was in *Birnbaum* no indication of a causal connection between the alleged violation of Rule 10b–5 and the injury to the corporation and its shareholders. The requirement has been interpreted fairly broadly in cases since *Birnbaum.* In Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540 (2d Cir. 1967), we held that shareholders of a corporation had standing under Rule 10b–5 to obtain injunctive relief to prevent controlling persons from depressing the price of the corporation's stock by market manipulation, even though the complaining shareholders had purchased their shares prior to the manipulation and had not yet sold them. The damage claim was dismissed for lack of a causal connection, *id.* at 547. See General Time Corp. v. Talley Industries, Inc., 403 F.2d 159 (2d Cir. 1968), cert. denied 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969); SEC v. General Time Corp., 407 F.2d 65 (2d Cir., 1968), cert. denied 393 U.S. 1026, 89 S.Ct. 637, 21 L.Ed.2d 570 (1969). In damage actions, this court in Symington Wayne Corp. v. Dresser Industries, Inc., 383 F.2d 840, 842 (2d Cir. 1967), referred to the decisions in A. T. Brod & Co. v. Perlow, *supra,* and Vine v. Beneficial Finance Co., *supra,* as having "expressly left undecided the question whether one who is neither a

purchaser nor a seller can attack a transaction under Rule 10b–5." [12] *Iroquois* declined to allow relief in a tender offer situation where plaintiff was neither a purchaser nor a seller.

The present case falls within the rationale of *Vine,* where we held that a minority shareholder in a short form merger is a "seller" since he is entitled only to cash for his shares. See also Dasho v. Susquehanna Corp., 380 F.2d 262 (7 Cir.), cert. denied Bard v. Dasho, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967). The effect of Standard's deception and manipulation was to deter Air Brake shareholders from tendering to Crane. The success of Standard's maneuver made Crane a forced seller of the newly issued Standard convertible preferred under threat of a divestiture action to be brought by Standard under the antitrust laws. [13] Thus, we have here in Crane one induced to sell by Standard's deception and manipulation and so within the protection of section 9(a) (2). Moreover, even if a narrower view were taken of section 9(a) (2), it would seem that Standard's conduct would still be actionable under Rule 10b–5(c), condemning conduct which operates as a fraud or deceit "upon any person."

The purchase-sale requirement must be interpreted so that the broad design of the Exchange Act, to prevent inequitable and unfair practices on securities exchanges and over-the-counter markets, is not frustrated by the use of novel or atypical transactions. A. T. Brod & Co. v. Perlow, *supra,* 375 F.2d at 397. "In determining who has standing to enforce duties created by statute, a court's quest must be for what will best accomplish the purposes of the legislature." Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 946 (2d Cir. 1969). The purpose of Congress in enacting sections 9(a) (2) and 10(b) was to protect the investing public from manipulation and deception by the use of devices which defrauded or misled investors in securities transactions. [14]

We find violation of both section 9(a) (2) and Rule 10b–5 and standing in Crane to raise the issue. The amendment to the Act adding section 14(e) (15 U.S.C. § 78n(e)) [15] effective July 29, 1968, subsequent to the events here in question, should serve to resolve any

---

12. See Opper v. Hancock Securities Corp., 367 F.2d 157 (2d Cir. 1967), aff'g 250 F.Supp. 668 (S.D.N.Y.1966); Commerce Reporting Co. v. Puretec, Inc., 290 F. Supp. 715 (S.D.N.Y.1968); Stockwell v. Reynolds & Co., 252 F.Supp. 215 (S.D. N.Y.1965); Voege v. American Sumatra Tobacco Corp., 241 F.Supp. 369 (D.Del. 1965).

13. The same might be said of the Air Brake stockholders who, after the merger were faced with the cancellation of Air Brake common stock, and whose alternatives were to exchange their Air Brake shares for the new preferred, or to enforce their appraisal rights as dissenting shareholders.

14. Congress when it used the phrase "in connection with the purchase or sale of any security" intended only that the device employed, whatever it might be, be of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell a corporation's securities.

＊　　＊　　＊　　＊　　＊

Therefore, when materially misleading corporate statements or deceptive insider activities have been uncovered, the courts, as they should, have broadly construed the statutory phrase "in connection with the purchase or sale of any security." SEC v. Texas Gulf Sulphur Co., *supra,* 401 F.2d at 860–861. See Heit v. Weitzen, *supra,* 402 F.2d at 913 (2d Cir. 1968).

15. 15 U.S.C. § 78n(e) provides:
"It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation."

doubts about standing in the tender offer cases, even where an offeror is not, as is Crane, in the position of a forced seller.

### THE AIR BRAKE PROXY STATEMENT

We turn now to the Air Brake proxy statement. Crane's principal contention is that the proxy statement misrepresents Standard's 1967 operating earnings and net income.

██ Rule 14a–9 of the Securities and Exchange Commission, 17 C.F.R. § 240.14a–9, provides that no proxy solicitation shall be made which under all the circumstances "is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading. * * * *" Violations of the proxy rules give rise to a private right of action under section 27. J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). Also applicable here is Rule 10b–5, which encompasses a similar concept of fraud. SEC v. National Securities, Inc., 393 U.S. 453, 466–469, 89 S.Ct. 564, 573, 21 L.Ed.2d 668 (1969). We do not separately discuss the scope of Rule 10b–5's general impact on fraud and material omission in proxy statements in view of our holding here that there was no violation of the detailed proxy rules.[16]

For liability to attach under Rule 14a–9 there must be a false or misleading statement, and it must be material.[17] Rule 3–02 of Regulation S–X. The representation must be one that would influence the stockholder's vote.[18] See Jennings & Marsh, Securities Regulation 964–1003 (2d ed. 1968); 2 Loss, Securities Regulation 917–918 (2d ed. 1961); Soward & Mofsky, Federal Proxy Regulation: Recent Extensions of Control, 41 St. John's L.Rev. 165 (1966). To the extent that the District Court rejected Crane's allegations as a matter of fact, the issue on appeal is whether on the record as a whole these findings are clearly erroneous. Fed.R.Civ.P. 52(a); United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948); cf. Comstock v. Group of Institutional Investors, 163 F.2d 350, 357 (8 Cir. 1947), aff'd 335 U.S. 211, 68 S.Ct. 1454, 92 L.Ed. 1911 (1948).

██ Crane asserts that Standard's foreign results were incorrectly presented by the statement in the proxy: "Foreign results improved in 1967, after a two-year decline." The proxy statement indicates that foreign results improved by $857,000 over 1966. Crane does not dispute that there was some improvement in Standard's foreign results. It contends, however, that $726,000 of this improvement resulted from the inclusion, for the first time, in the 1967 consolidated statement of the operations of the Brazilian subsidiary, $426,000 of which are attributable to the earnings of that subsidiary prior to 1967. Although Rule 4.04(b) of Regulation S–X requires specific mention of the inclusion in a consolidated statement of the earnings of a subsidiary not similarly included in the previous statement,[19] the rule is not

---

16. See Miller v. Steinbach, 268 F.Supp. 255, 278–279 (S.D.N.Y.1967); Simon v. New Haven Board & Carton Co., 250 F.Supp. 297 (D.Conn.1966); Barnett v. Anaconda Co., 238 F.Supp. 766, 776 (S.D.N.Y.1965).

17. Richland v. Crandall, 262 F.Supp. 538 (S.D.N.Y.1967).

18. Miller v. Steinbach, *supra* n. 16; Dunn v. Decca Records, Inc., 120 F.Supp. 1 (S.D.N.Y.1954); Kaiser-Frazer Corp. v. Otis & Co., 195 F.2d 838 (2d Cir. 1952), cert. denied 344 U.S. 856, 73 S.Ct. 89,

97 L.Ed. 664 (1952) (material exaggeration of earnings trend).

19. 4.04(b) As to each consolidated statement and as to each group statement of unconsolidated subsidiaries, a statement shall be made as to whether there have been included or excluded any persons not similarly treated in the corresponding statement for the preceding fiscal period filed with the Commission. If the answer to the foregoing is in the affirmative, the names of such persons shall be given.

dispositive here. Standard had consistently followed the practice of consolidating all foreign subsidiaries in a comparable status to the Brazilian subsidiary in 1967, and there was a determination by independent public accountants that the Brazilian subsidiary's operations were not of such materiality in the overall consolidated results of operations, over $13,-350,000 net income, as to warrant specific mention. The District Court found that the method used by Standard was according to generally accepted accounting procedures and presented a true financial picture. This finding is a recognition of the fact that full disclosure does not require the inclusion in a proxy statement of every relevant detail of a company's operation. While mention in the statement would have pointed out the true situation more accurately, we recognize that the requirement of materiality is a matter to be determined upon all of the relevant facts and circumstances, Richland v. Crandall, *supra* n. 17, Rule 3-02 of Regulation S-X,[20] and we find no error in the court's finding that the accountant's treatment was proper here.

■ Crane also challenges the following statement in the proxy relating to Standard's 1967 U.S. results:

> Income improved moderately in the latter half of 1967 due to improvements in housing construction but the increase in earnings was mainly due to the inclusion of the Mosler Safe Company's operations since date of acquisition in May 1967. Mosler sales since acquisition in 1967 amounted to $51,249,000.

Crane asserts that this statement is misleading because there was no increase apart from Mosler, and the statement erroneously gives the impression that Standard's 1967 domestic earnings apart from Mosler improved over 1966, whereas in fact they declined by $1,055,000. While the statement might have been better phrased than by the use of the words "mainly due," it does convey a sufficiently accurate picture of Standard's American operations so as not to mislead. The proxy statement does not claim that each and every phase of the operations of Standard improved in 1967. The statement explicitly says that income declined during the first half of 1967 and reports a modest improvement in the second half due to the inclusion of Mosler's operations in the second half. Such inclusion of the operations of a consolidated subsidiary is accepted accounting practice. SEC Regulation S-X, Rule 4-02. The benefit obtained through the acquisition was a part of Standard's true picture for 1967.

■ Crane further maintains that 1967 earnings were overstated by 25 percent by failing to charge foreign currency losses of $3,333,000 against income, citing Rule 3-09 of Regulation S-X. This claim is not well taken. The $3,333,000 item was an unrealized loss which had not yet been taken by conversion of the foreign currencies into U. S. dollars. The facts as to the unrealized 1967 foreign exchange loss were fully disclosed in the proxy statement. The amount of the loss was stated and the account to which it was charged was specified.[21] The loss was charged against a reserve which had been specifically set up to absorb such losses and gains, a method of accounting which had been followed by Standard since 1959. There was testimony by Standard's accountants and experts that the reserve was properly created in accordance with generally accepted accounting principles to cover the unrealized effects of foreign cur-

---

20. If the amount which would otherwise be required to be shown with respect to any item is not material, it need not be separately set forth in the manner prescribed.

21. Note 1 to the consolidated statement is as follows:

The financial statements of the consolidated foreign subsidiaries have been converted to U. S. dollars at year-end rates of exchange. . . . *Unrealized* exchange losses principally in England and Brazil aggregating $3,333,000 in 1967 were charged to the Reserve for Foreign Operations.

rency valuations. The District Court accepted this testimony as against appellant's claims.[22] Crane has not established that this finding was clearly erroneous.

Crane's contention that the Accounting Principles Board Opinion No. 9 requires a different result is not sustainable.[23] The opinion does indicate a concern that such losses pass through the income statement for the applicable year. Such a concern with reflecting the results of operations of a corporation during a particular period of time does not require departure from Standard's method here, where the losses were unrealized, a reserve had long before been created from the results of past earnings, the treatment had been consistent for many years, and there was expert opinion testimony that there is no principle of accounting which requires any other treatment in light of the particular reserve created. This is not a situation where a company utilized the reserve to mislead, reporting favorable items in the income statement and unfavorable items as direct charges to earned surplus without adequate comment elsewhere. Crane's contention that the 1967 earnings were misleading regardless of compliance with generally accepted accounting principles cannot be sustained. If the deviation was not properly an item of profit or loss in 1967, there was no material exaggeration of the trend of Standard's earnings. Compare Kaiser-Frazer Corp. v. Otis & Co., *supra* n. 18. Since the facts as to the unrealized 1967 foreign exchange loss were adequately discussed in the proxy statement, there is not here any misstatement or omission which would influence the stockholder's vote. See Miller v. Steinbach, *supra,* n. 16.

Crane's second charge against the proxy statement is that Air Brake's management falsely stated to the shareholders its reasons for recommending the merger and falsely stated that careful consideration had been given to the merger. See SEC v. Okin, 137 F.2d 862, 148 A.L.R. 1019 (2d Cir. 1943). The "due consideration" claim stems from the following statement in the letter of transmittal attached to the face of the proxy:

The number of shares of American-Standard to be received by WABCO shareholders upon the merger, the provisions of those shares, and all other terms and provisions of the merger were agreed to by the two companies after careful consideration of, among other things, the earnings, market prices and book values of the respective stocks, and the dividend and conversion privileges of the American Standard stock to be issued to the WABCO shareholders.

As to this claim, the District Court found as follows:

The evidence discloses that the proxy statement approved by the Commission gives evidence of much thought, as do the extraordinary pre-solicitation letters of McCord to the stockholders. * * * [B]eginning the middle of July, 1967, Air Brake secured and obtained and acted upon the advice of its accountants, house counsel and general counsel and the advice of a proxy solicitation public relations firm and were preparing to resist the attempts of Crane to force a merger of Air Brake with Crane. Each step taken by Crane and each step taken by Air Brake was carefully thought out and planned. The stakes were high and

---

22. "I find the plaintiff's expert testimony did not refute this by a fair preponderance of the evidence. The best that emerged from all the testimony on the subject seemed to be that the accounting profession is desirous of establishing uniformity in reporting such losses or gains, at least to stockholders, and that they advocate that these losses be taken against and gains credited to income rather than to a reserve as reflecting a truer picture."

23. Compare, Norte & Co. v. Huffines, 288 F.Supp. 855 (S.D.N.Y.1968).

their steps were measured and weighed before they were taken. * * * Suffice it to say that there has been no hint and no evidence of any improper motives. Certainly the prevention of a takeover of the company is not actionable unless the law has been violated and I find no federal staute or rule has been violated.

The finding of "due consideration" is supported by the record. McCord testified that as early as December 1967 he received a preliminary inquiry from Standard's president concerning the possibility of a merger. McCord met with Air Brake's board of directors on January 22 and February 7, 1968, at which meetings the desirability of merger talks with several companies was discussed. The board specifically authorized McCord to proceed with detailed studies of the consequences of a merger with Standard, or alternative companies, and at the February 7 meeting the board authorized McCord to determine what value Standard would place on Air Brake shares in the event of an exchange offer. On February 19 Standard made its first suggestions as to possible terms of merger. McCord met with three of Air Brake's ten directors the following day. At that meeting Mayer produced charts detailing Standard's markets, sales records and profit margins, accompanied by Mayer's comments that Standard was not in any more attractive line of business than Crane. This had been confirmed by the Kearney report of January 15, reference to which was omitted in the discussion. Nonetheless, the directors were impressed with the high valuation

offered for Air Brake stock, $50 per share, and authorized McCord to negotiate the merger. Finally on March 4, the Air Brake board reviewed the provisions of the preliminary merger agreement in detail. A report prepared by the financial vice-president of Air Brake was distributed to each director, as was a general statement written by McCord. McCord reported to the board that he had discussed Standard's operating program with Standard's president, Mr. Eberle, and that Standard had generally reached their objectives. The board discussed such subjects as the proposed conversion ratio, the market price of Standard stock, Standard's price-earnings ratio, the opportunity to increase the profitability of Standard, and the future earnings of Air Brake stockholders.

The facts emphasized by Crane do not compel a different conclusion. Crane argues that the effect of the merger would be to increase the concentration of Air Brake's shareholders' investment in plumbing and heating supplies. The proxy statement, however, did not represent that the merger would result in greater percent-sales-per-product-line diversification. It only stated that the board "believes that the merger * * * [will provide Air Brake shareholders with] interests in new manufacturing and marketing fields in which WABCO is not presently engaged." [24] Crane's further argument is that the board on March 4 had no advance preparation for the hastily called meeting of seven of the ten directors, and those present exercised no independent judgment but merely relied on McCord's representa-

24. The full text reads as follows:
Your Board of Directors believes that the merger with American-Standard will benefit shareholders of WABCO by providing them, on a favorable basis, interest in new manufacturing and marketing fields in which WABCO is not presently engaged. American-Standard is an international producer of building products, industrial and technical products, and bank, security and office systems. Upon the joinder of those businesses with WABCO operations, the resulting company will have an established position in the industrial world in the combined, broader based lines of business under competent management; will have available greater resources for expansion and research and will have more diversified sources of business and income. It is believed that these conditions should enhance the value of the holdings of shareholders of WABCO and the dividends on their shares to a greater extent than could be achieved by WABCO alone.

tions. McCord himself admitted that he did not point out at the meeting that the report prepared by Eberle indicated that Standard's net income for 1967 was about $5,000,000 less than planned. Nonetheless, such allegations fall far short of a deception practiced upon the corporation or a failure to exercise the care required of the directors as fiduciaries.[25] The circumstances surrounding the merger negotiations do not indicate that the directors were without a reasonable basis in fact for their recommendation. See Leavell, Investment Advice and the Fraud Rules, 65 Mich. L.Rev. 1569 (1967); SEC v. Okin, *supra.*

Crane also argues that the proxy statement falsely states the basis for the recommendation, and fails to disclose that the recommendation was a product of an unjustified design to prevent Crane from acquiring control. Crane points to statements by McCord that he concluded on January 3 that it was Air Brake's interest to remain independent, but by February 20 he had come to the conclusion that if necessary to prevent a takeover, Air Brake should merge with another company. McCord, however, also stated that a takeover of Air Brake by Crane would have a marked effect on the business and management of Air Brake since the Crane management was not the equal of Air Brake's.

The District Court found that there were no improper motives underlying the action of the Air Brake directors. Moreover, it is sufficient that the relevant facts were fairly stated in the proxy statement.[26] The proxy statement clearly pointed out that the board of directors opposed the Crane takeover, and that certain Air Brake personnel would be employed with Standard after the merger.[27] Crane has not shown that the proxy statement under all the circumstances is false or misleading with respect to any material fact, i. e., a fact that would influence the stockholders to act differently if disclosed. We agree with the District Court that the directors did not breach their duty of disclosure with regard to the proxy statement.

We affirm the District Court's dismissal of the claim as to the Air Brake proxy statement; we reverse the judgment below dismissing the claim based upon market manipulation and deception, and remand for a further determination in the District Court of the appropriate remedies. Without limitation, these remedies may include damages, if any, prospective injunctive relief, as well as appropriate retrospective relief, notwithstanding the consummation of the merger. See J. I. Case Co. v. Borak, *supra.* The manipulation may be found to have deprived Crane of success in its tender offer in the free market to

25. Compare, Ruckle v. Roto American Corp., 339 F.2d 24 (2d Cir. 1964); O'Neill v. Maytag, 339 F.2d 764 (2d Cir. 1964); SEC v. Texas Gulf Sulphur Co., *supra* at 401 F.2d 833 (2d Cir. 1968); cf. SEC v. Capital Gains Research Bureau, 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963).

26. See Doyle v. Milton, 73 F.Supp. 281, 285–286 (S.D.N.Y.1947); Laurenzano v. Einbender, 264 F.Supp. 356 (E.D.N.Y. 1966).

27. "Crane Company is making an offer to exchange your WABCO shares for subordinated debentures of Crane Company. This represents the latest step by Crane in its campaign to take over control of your company. We must make certain points very clear:

(1) This offer was not negotiated with your management.

(2) If you tender your shares to Crane, you are irrevocably bound. You may not withdraw your shares if you change your mind or wish to sell. In contrast you may vote the enclosed proxy for the American-Standard merger and are still free to revoke your proxy or sell your shares or accept Crane's offer.

\* \* \* \* \*

It is contemplated that the business conducted by WABCO prior to the consummation of the merger will be continued thereafter by the present personnel of WABCO in a new wholly-owned subsidiary of American-Standard which will be named Westinghouse Air Brake Company."

**804**

which it was entitled, in which case divestiture or separation of Air Brake may be required. Consummation of the transaction cannot be allowed to preclude any relief for violations of the securities laws.

We do not suggest that such a drastic result as divestiture or separation must necessarily be reached in this case. Crane must establish that any relief sought is equitably required, considering the effect on other shareholders and the diligence with which Crane sought to prevent consummation of the merger and to obtain delay in its implementation pending expeditious review of the denial of injunctive relief by the trial court. See discussion in Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 947–948 (2d Cir. 1969).