**Sol HIRSH and Sol Magezis Kagan, Executors under the Last Will and Testament of Ray Hirsh, Deceased, Plaintiffs,**

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Investors Management Co., Inc., Madison Fund, Inc., J. M. Hartwell & Co., J. M. Hartwell & Co., Inc., Hartwell Associates, Park Westlake Associates, Van Strum & Towne, Inc., Fleschner Becker Associates, A. W. Jones & Co., A. W. Jones Associates, City Associates, Fairfield Partners, Burden & Co., the Dreyfus Corporation, Anchor Corporation and McDonnell Douglas Corporation, Defendants.**

No. 68 Civ. 5183.

United States District Court,
S. D. New York.

March 20, 1970.

**1284**

———◆———

Abraham I. Markowitz, New York City, for plaintiffs.

Brown, Wood, Fuller, Caldwell & Ivey, New York City, for defendant Merrill Lynch, Pierce, Fenner & Smith Inc.

Shearman & Sterling, New York City, for defendant City Associates.

Coudert Brothers, New York City, for defendants J. M. Hartwell & Co., J. M. Hartwell & Co., Inc., Hartwell and Associates and Park Westlake Associates.

Milbank, Tweed, Hadley & McCloy, New York City, for defendant Van Strum & Towne, Inc.

Seward & Kissel, New York City, for defendants A. W. Jones & Co. and A. W. Jones Associates.

Debevoise, Plimpton, Lyons & Gates, New York City, for defendants Burden Investors Services, Inc. and William A. M. Burden & Co.

Royall, Koegel & Wells, New York City, for defendant The Dreyfus Corp.

Oliver C. Biddle, Philadelphia, Pa., Baker, Nelson, Williams & Mitchell, New York City, for defendant Madison Fund, Inc.

Sullivan & Cromwell, New York City, for defendant Fleschner Becker Associates.

## OPINION

COOPER, District Judge.

Defendants move, pursuant to Rule 12(b)(6), F.R.Civ.P., to dismiss the complaint for failure to state a claim upon which relief can be granted.

This suit arises out of alleged fraudulent transactions of McDonnell Douglas Corp., ("Douglas") Merrill Lynch, Pierce, Fenner and Smith, Inc. ("Merrill Lynch") and a group of tippees ("the selling defendants") involving the sale of Douglas stock during June 20, 1966 to June 24, 1966 in violation of the Federal Securities Laws and the pertinent rules and regulations of the Securities and Exchange Commission. The complaint alleges that Douglas issued a report on June 7, 1966 indicating earnings of 85 cents per share on its stock for the first five months of its fiscal year 1966. In reality, it is claimed, Douglas' past earnings and future prospects were not that bright. On June 20, 1966, the President of Douglas disclosed to a Vice-President of Merrill Lynch[1] that his company's earnings for the first six months of fiscal 1966 had in fact fallen to 49 cents per share. Merrill Lynch, in turn, passed this information along to a restricted group of its customers, the selling defendants, who either sold shares of Douglas stock held in their own account or effected short sales. On June 24, 1966, after the stock had fallen from $87 per share (its June 24th price) to $76 per share, Douglas issued a news release and for the first time publicly reported the sharp drop in its earnings.

1. Merrill Lynch received this information when it was acting as a principal under-writer of a proposed offering of Douglas debentures.

Plaintiff brings this action in its own behalf as an individual owner of 124 shares of Douglas stock and as a class action on behalf of all other persons who were stockholders of Douglas between June 20, 1966 and June 24, 1966. He alleges that the defendants' activities constituted violations of Section 17(a) of the Securities Act of 1933 (15 U.S.C. § 77q), Sections 10(b) and 15(c) (1) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b), 78O(c) (1) ), and Rules 10b–5 and 15c 1–2 promulgated thereunder.

Defendants, in moving for dismissal assert that plaintiff's failure to "claim that they, or any of the Douglas stockholders they purport to represent, ever purchased or sold Douglas stock from or through these defendants or in reliance upon anything these defendants said or omitted to say" is a fatal defect in the complaint. (Memorandum in Support of Defendants' Motion to Dismiss, October 30, 1969, p. 3).

It is admitted that plaintiff's purchase of Douglas stock occurred prior to the events of June 1966, and that he sold its shares some six months after the June 24th public release. However, plaintiff argues alternatively that: (a) under "the provisions of Rule 10b–5 as it applies to the instant case * * * plaintiffs were [not] required to sell the stock to come within its provisions" but need only establish that material information was fraudulently withheld which would "have influenced an investors' judgment to buy, sell or hold such secu-

rity" (Memorandum in Opposition to Motion to Dismiss. February 3, 1970, pp. 13–14); (b) "the failure by the defendants to disclose the material information in their possession coupled with their [defendants] sales of stock operated as a fraud and deceit * * * in connection with the purchase or sale of any security" (Memorandum in Opposition to Motion to Dismiss, February 3, 1970, p. 11); (c) plaintiff's eventual sale fulfilled the necessary transfer requirement. (Memorandum in Opposition to Motion to Dismiss, February 3, 1970, pp. 12–13). Section 10(b), in essence, accords the general investing public salutary protection from manipulative or deceptive schemes.[2] The crucial language of Rule 10b–5[3] with which we must grapple reads " * * * in connection with the purchase or sale of any security."

The single issue this Court must consider is whether plaintiff's position as a shareholder of Douglas stock at the time of defendants' alleged misrepresentations satisfies 10b–5's jurisdictional requirement that defendants' failure to disclose material information occur in *"connection with the purchase or sale of any security."* (emphasis added). Plaintiff's entire complaint falls upon his non-compliance with this requirement; 10(b) provides him his broadest remedies. Superintendent of Insurance of State of New York v. Bankers Life & Casualty Co., 300 F.Supp. 1083, 1094 (S.D.N.Y.1969).

2. Section 10(b) makes it unlawful:
"To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

3. Rule 10b–5 provides:
"It shall be unlawful for any person, directly or indirectly, by use of any means

or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, (1) to employ any device, scheme, or artifice to defraud, (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

### The Birnbaum rule

In Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), this Circuit, after extensive analysis of Section 10b–5's legislative history concluded that the

> "section was directed solely at that type of misrepresentation or fraudulent practice usually associated with the sale or purchase of securities rather than at fraudulent mismanagement of corporate affairs, and that Rule X–10B–5 extended protection only to the defrauded purchaser or seller."

Birnbaum thus established the rule that a plaintiff could seek relief under 10(b) only if his injuries arose out of an actual purchase or sale.[4]

Since Birnbaum, there has been substantial litigation concerning the continued validity of its holding. While the doctrine has been repeatedly reaffirmed, see e. g., Greenstein v. Paul, 400 F.2d 580 (2d Cir. 1968); O'Neill v. Maytag, 339 F.2d 764 (2d Cir. 1964); Christophides v. Porco, 289 F.Supp. 403 (S.D. N.Y.1968); Chashin v. Mencher, 255 F. Supp. 545 (S.D.N.Y.1965); Keers & Co. v. American Steel & Pump Corp., 234 F.Supp. 201 (S.D.N.Y.1964), its initial area of applicability has been extended. Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir.1967); A. T. Brod & Co. v. Perlow, 375 F.2d 393 (2d Cir.1967); Stockwell v. Reynolds & Co., 252 F.Supp. 215 (S.D.N.Y.1965). A lengthy discourse on these numerous cases would add little in light of the extensive examination they have already undergone. See e. g., Cohen, The Development of Rule 10b–5, 23 BUS.LAW 593 (1968). Suffice it to note that while a clear majority of holdings resulted in dismissal of complaints because of a failure to satisfy Birnbaum's requirements, enough cases made substantial inroads on the doctrine (see, e. g., Vine, supra; Brod, supra), to lead one district court judge to suggest that "it may well be that purchaser-or-seller requirement of Birnbaum will not be followed when the question is next presented to the Court of Appeals." Entel v. Allen, 270 F.Supp. 60, 70 (S.D.N.Y.1967); Lowenfels, The Demise of the Birnbaum Doctrine: A New Era for Rule 10b–5, 54 Va.L.Rev. 268 (1968).

However, in Greenstein v. Paul,[5] 400 F.2d 580 (2d Cir. 1968), the court in answering the question as to whether there must be a sale of stock by a plaintiff before he can invoke the implied civil remedies afforded by 10(b) stated:

> "It has long been the rule in this circuit that to maintain an action under § 10(b) of the Act and Rule 10b–5 of the Securities and Exchange Commission the plaintiff must have been a seller of the stock involved. Birnbaum * * *. Although criticized * * * it is still the rule at least insofar as actions for damages are concerned."

In Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963 (2d Cir. 1969), our Circuit appeared to resolve any lingering uncertainty as to whether

4. In Birnbaum, plaintiffs, stockholders of Newport Steel Corp., sought to prosecute a derivative suit against the former president and major shareholder of the corporation because of his rejection of a merger offer highly favorable to all the shareholders coupled with sale of his control stock at a substantial premium. Their complaint was dismissed because they were not members of a class of defrauded purchasers or sellers of securities.

5. In Greenstein, plaintiff, a stockholder of Sagamore Manu. Co., sought an accounting and damages charging defendants (stockholders and directors of United Industrial Syndicate, Inc., a New York corporation owning 80% or more of the stock of Sagamore) with conspiring to depress the price of Sagamore shares on the market by syphoning off assets of the corporation and then purchasing the shares of the other stockholders at this lower price. Plaintiff, one of the minority shareholders had refrained from selling his shares despite the drop in their market value due to defendants' alleged manipulation. His status was found insufficient to satisfy 10b–5's purchaser-seller limitation.

or not the purchaser-seller requirement of 10(b) would be continued. The Court held:

> "The rule laid down in *Birnbaum* is that a civil action under Section 10(b) of the 1934 Act (15 U.S.C. § 78j(b) ) may be maintained only by a purchaser or seller of securities. We find no reason to deviate from that rule in the present case." 417 F.2d at 965.

Iroquois sought to acquire, by means of a tender offer, working control of Syracuse. Defendant's management, as part of its successful tactics in resisting the tender offer, made fraudulent statements to their stockholders to induce them to refrain from accepting plaintiff's offer. On these facts, the Court concluded that:

> "Iroquois is not here complaining that it was misled by the acts of defendants as to any purchases or sales by it of Syracuse China stock; indeed, its basic complaint is that, because of the acts of defendants, it could not purchase such shares." 417 F.2d at 967.

Since a claim under Section 10(b) must relate to a purchase or sale as to which plaintiff was defrauded, the court found the Iroquois position[6] insufficient to support a claim under 10(b).[7]

## The Crane case

However, the most recent Circuit Court case in this area, Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787 (2d Cir. 1969), poses difficult questions as to both the validity and the scope of *Birnbaum*.[8]

Crane initiated merger negotiations with Westinghouse, and in support of this goal began purchasing substantial shares of Westinghouse. Some six months later, Westinghouse notified plaintiff that it no longer wished to pursue the negotiations. Crane, a beneficial owner by this time of nearly 10% of Westinghouse stock outstanding, in response to this rebuff, embarked on a systematic program of purchasing Westinghouse shares with the ultimate aim of replacing members of the Westinghouse board with others more receptive to its merger offer.[9] Westinghouse directors, meeting in special session, agreed upon a merger of Westinghouse with American Standard Inc., plaintiff's largest competitor.

Crane, in response mailed to stockholders of Westinghouse an offer to exchange Crane stock and debentures totalling $50 for each share of Westinghouse. Defendants' improper market

---

6. Iroquois' status was one of an aborted purchaser; were it not for defendant's fraudulent representations, it would have purchased shares. Its position is thus similar to plaintiff Hirsh, in that Hirsh alleges he would have sold his shares of Douglas had defendants not failed to disclose Douglas' poor financial condition on June 20, 1966. The aborted purchaser-seller has not been defined as satisfying the Birnbaum rule. Kahan v. Rosenstiel, 300 F.Supp. 447 (D.Del.1969); Keers & Co. v. American Steel & Pump Corp., 234 F.Supp. 201, 203 (S.D.N.Y. 1964).

7. The court also held:
"* * * the Birnbaum rule recognizes the policy of Congress in enacting Section 10(b) and of the Commission in adopting Rule 10b–5, namely, the protection of defrauded purchasers and sellers. It is not the province of the courts to extend Section 10(b) to apply to transactions not intended to be covered by Congress." 417 F.2d at 969. See also, *Entel, supra*, 270 F.Supp. at 70.

8. The court appeared to broadly define 10(b)'s application to include plaintiffs who had not actually participated in a securities transaction.
"[T]his court * * * expressly left undecided the question whether one who is neither a purchaser nor a seller can attack a transaction under Rule 10b–5. *Iroquois* declined to allow relief in a tender offer situation where plaintiff was neither a purchaser nor a seller."
419 F.2d at 797–798.

9. Westinghouse, seeking to prevent plaintiff from obtaining representation on its board of directors amended the Westinghouse by-laws by increasing the minimum cumulative vote necessary to obtain representation on the board from 9.1 per cent to 25 per cent. Crane, undeterred, filed with the SEC its 14–B statement declaring its intention to solicit proxies to elect directors to the Westinghouse board.

manipulation[10] on the day plaintiff's proposal was to expire sufficiently reduced the attractiveness of the $50 package to defeat plaintiff's tender offer. Undaunted, Crane continued to accumulate Westinghouse stock in the market.[11] At a special meeting of Westinghouse stockholders on May 16, 1968, Westinghouse merger with Standard was approved.

The merger became effective on June 7, 1968, upon which date Westinghouse stock was converted into shares of a new issue of Standard convertible preferred. Crane thus found itself in the embarrassing position, after its substantial holdings in Westinghouse were exchanged, of owning 740,311 shares of preferred stock in its largest competitor. On June 13, 1968, with a threat by Standard of instituting a divestiture action under the antitrust laws, Crane sold practically all of its shares of Standard.[12]

The Court found that the method used by Standard to lessen the appeal of Crane's tender offer constituted improper market manipulation and misrepresented to the public that there was a great demand for Westinghouse stock at a value in excess of $50.[13]

The Court found that defendants' failure to disclose its manipulations to both the general investing public and Westinghouse stockholders operated as a fraud or deceit on Crane in connection with the purchase and sales of securities, and created a right to relief for plaintiff quite apart from its rights as a forced seller under Section 9(a) (2).

"When securities are subject to trading dominated by an insider such as Standard, there is an obligation to disclose material information to the investing public, and this duty gives rise to *liability under 10b–5 to third persons who, as a result of the deception practiced upon the public, are prevented from entering into securities transactions with members of the public.* When Crane entered the securities market with its tender offer, it was entitled to the Act's protection not only against being deceived itself but also against deception of the investing public designed to prevent the public from entering into securities transactions. 419 F.2d at 796. (emphasis added)

### Crane ruling inapplicable

While *Crane* appears to extend the scope of the *Birnbaum* rule, we find *Iroquois* controlling in the situation before us. We reach this result because of two distinctions between the positions of plaintiff Hirsh and Crane; these we find dispositive.

First, *Crane* can be considered as defining the application of the *Birnbaum* rule to a unique category of plaintiff— "a forced seller." As a direct result of defendants' manipulation, Westinghouse management was able to insure stockholder approval of its merger with Standard and thereby coerce plaintiff, under threat of a private antitrust suit, to divest itself of shares it then held in its largest competitor. The *Crane* court found that "the * * * case falls within the rationale of *Vine*, where we held that a minority shareholder in a short form merger is a 'seller' since he

10. On the final day of Crane's tender offer, Standard purchased 170,000 shares of Westinghouse stock at $49.50 per share, and sold 100,000 shares off the market to Investors Diversified Services and 20,000 shares on the market to Dillon Read at an average price of $44.50 per share, taking an apparent loss of more than $500,000 on its purchases and sales for the day.

11. By the end of May 1968, Crane held almost ⅓ of Westinghouse's outstanding shares.

12. While Crane was frustrated in its attempt to take over Westinghouse, its buying program of Westinghouse stock was not fruitless. The "forced sale" resulted in a Crane profit of several million dollars. 419 F.2d at 791.

13. "It is reasonable to conclude that many Air Brake stockholders who might otherwise have chosen to tender to Crane choose not to do so because their own holdings in Air Brake looked better as the price went up." 419 F.2d at 793.

is entitled only to cash for his shares."[14] Here, plaintiff cannot be considered as falling within this recognized "extension" of Birnbaum; a modification consistent with the *Iroquois* holding.

Second, in *Crane* liability ran "to third persons who, as a result of the deception practiced upon the public, are prevented from entering into securities transactions with members of the public." 419 F.2d at 796. Crane actively sought to acquire shares of Westinghouse; had it not been for defendant's market manipulation, numerous shareholders would have completed sales transactions by accepting Crane's outstanding offer.[15] The *Crane* court stated that before 10(b) is satisfied "what must be shown is that there was deception which misled [other] stockholders and that this was *in fact the cause* of plaintiff's claimed injury." 419 F.2d 797. In *Crane* this prerequisite was clearly met; were it not for Standard's manipulation, plaintiff's tender offer stood a strong chance of success.

Here, while it is clear that defendants' trading on inside information misled others to purchase shares of Douglas anticipating substantial dividends,[16] this deception was not the factual cause of plaintiff's injury and in no way prevented him from selling his Douglas shares in the market during June 20, 1966 to June 24, 1966. As in *Birnbaum*, there is no indication of a causal connection between the alleged violation of Rule 10(b) and the injury to the corporation and its shareholders. Plaintiff's injuries were caused by Douglas' poor financial condition as evidenced by a decrease in its declared dividend and the inevitable corresponding fall of its price per share on the market. Had defendants not engaged in alleged activity violative of the Securities Act, plaintiff would still have suffered its monetary loss. Every shareholder could not have gotten out of the corporation at its high of $87 per share as soon as the press release hit the tapes. Further, plaintiff retained his shares for six months after the true financial picture of Douglas became publicly known.

Finally, recognition of the *Birnbaum* purchaser-seller limitation will not result in this case in a novel or a typical scheme being declared immune from judicial review and allowed to frustrate the Securities Act intention of preventing inequitable and unfair practices on securities exchanges. At least those purchasers of Douglas stock during June 20, 1966 to June 24, 1966 satisfy its requisite for standing.

As our Circuit stated in *Greenstein, supra* and reaffirmed in *Iroquois*, *Birnbaum* is still the rule, at least insofar as actions for damages are concerned. While *Crane* clearly indicates that there are situations where 10b–5's purchaser-seller requirement will not be given as restricted an application as originally outlined in *Birnbaum*, we do not find the present case warrants our extending 10b to include plaintiff's

---

14. In Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir.), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967), defendants, by fraudulent misrepresentation obtained 95% of the shares of Crown Finance Co., Inc., and executed a short form merger. Plaintiff's position, as a "dissenting" shareholder of Crown who had refused to accept defendant's offer and retained his securities, was found to satisfy 10b–5's requirements because he could only recover the fair value of his shares by judicial appraisal or from defendants by private agreement. Either alternative would require him to "sell" his shares as defined in 10(b).

15. This situation is somewhat analogous to that in Stockwell v. Reynolds & Co., 252 F.Supp. 215 (S.D.N.Y.1965), where despite repeated requests by plaintiff to sell his shares, defendant actively dissuaded him from selling by making false representations. Defendants' actions directly prevented plaintiff from entering into a stock transaction.

16. Defendant's activities clearly satisfies the "in connection with" language of Rule 10(b) as to those buyers of Douglas stock on June 20, 1966 to June 24, 1966. See *e. g.*, Heit v. Weitzen, 402 F.2d 909 (2d Cir. 1968).

claim within its jurisdictional basis. Plaintiff's three suggested alternatives fall short of satisfying 10b–5's requirement that he be a purchaser or seller of securities as defined by our Circuit.

Accordingly, defendants motion to dismiss the complaint for failure to state a cause of action is granted.

So ordered.