Edwabd J. Greenfield, J.
In this action plaintiff, on behalf of herself and all persons similarly situated, seeks a declaratory judgment that the plan to co-op the building at 250 West 94th Street in which she resides fails to comply with the requirements of the General Business Law of the State of New York and the New York City Rent, Eviction and Rehabilitation Regulations, and asks the court to enjoin any attempt to consummate the plan.
Plaintiff’s motion for a preliminary injunction, and defendants ’ cross motion to dismiss the complaint came on before Mr. Justice Leff, who granted the motion for a temporary injunction, denied the cross motion, and set the matter down for an early trial.
On the trial, defendants again moved to dismiss the complaint, urging that plaintiff had no standing to bring a class action, and that the only way the sufficiency of the prospectus formulating the co-op plan could be challenged was in an article 78 proceeding to review the acceptance of the plan by the Attorney-General. They also urged, of course, that on the merits plaintiff had failed to establish any illegality in the proposed plan, or any defect in the announcement of its effectiveness.
This court need not deal at length with the threshold questions of standing to sue and the propriety of a plenary suit, since Mr. Justice Leff, on the authority of Gilligan v. Tishman Realty & Constr. Co. (283 App. Div. 157, affd. 306 N. Y. 974) and Pensic v. Sultzberger (N. Y. L. J., July 16, 1970, p. 2, col. 2 [Sup. Ct., N. Y. Helman, J.]) has already held that plaintiff has standing to bring this action in the form in which it is brought, and also ruled that this court is the proper forum for testing the propriety of the prospectus. While counsel for defendants question whether those two cases in fact justify the conclusion that plaintiff can proceed with a class action under CPLR 1005 (subd. [a]), this court cannot sit in review of that determination by a colleague, since it has no appellate powers, and must accept the rulings by Mr. Justice Leff on the form of action and on jurisdiction, which were central to the motions before him. This does not mean that this court is not free to rule on those matters which were not conclusively passed on, or those judicial observations which were not essential to the prior determination.
On the prior motion to dismiss the complaint, the defendants argued that review of the offering and prospectus under section *256 352-e of the General Business Law could take place only before the Attorney-General, who was vested with the exclusive right to pass on the sufficiency and propriety of the matters presented in the prospectus, and that once he passed on it, there could be no further recourse to the courts. Mr. Justice Lew properly rejected this argument. On this trial defendants, and amicus curios representing the Tenants’ Owned Apartments Association, take a somewhat different position^that the Attorney-General is vested with exclusive jurisdiction to deal with the matters required by law to be set forth in the prospectus, and that this court is a proper forum for the review of his determination in an article 78 proceeding, and not by plenary action.
To the extent that new rights and obligations are created by statute, the vehicle for the enforcement of such rights and obligations is the remedy set forth in the statute. (Sajor v. Ampol, Inc., 275 N. Y. 125; People v. Gorman, 133 Misc. 161, 163; Train v. Sisti, 146 Misc. 362; 56 N. Y. Jur., Statutes, § 274.) Section 352-e of the General Business Law does create new rights and obligations. All public offerings of securities constituting a participating interest in real estate are to be filed with the Department of Law, and the statute sets forth in detail the information required to be disclosed therein, without material omissions or misstatements. The Attorney-General is required to indicate any deficiencies in the offering statement or prospectus, and is empowered to apply to the Supreme Court for an injunction against any person violating these provisions (§§ 352 — i, 353), or to ask for the appointment of a receiver (§ 353-a). He is also empowered to undertake criminal prosecution (§ 358).
As to those matters exclusively within the purview of the Attorney-General — compelling the disclosure of the required information, the remedy is exclusively with the Attorney-General, either to refuse the prospectus for filing, or after filing, when a fraudulent practice is disclosed, to seek injunctive relief. People v. Bunge Corp. (25 N Y 2d 91, 97) instructs us that the Attorney-General’s decision to act or not to act in seeking an injunction or to institute criminal prosecution is an executive action not reviewable by the courts, but when he acts as an administrative official in filing or withholding the filing of a co-op plan, his action or inaction is subject to an article 78 review, in which the question posed is whether his actions were arbitrary and capricious or based upon some rational and reasonable ground. (Matter of Diocese of Rochester v. Planning Bd. of Town of Brighton, 1 N Y 2d 508, 520; 3 Loss, Securities Regulations [2d ed., 1961], p. 1668. Cf. Lupardo v. I.N.M. Industries Corp., 36 F. R. D. 438 [S. D. N. Y., 1965].)
*257 However, when the statute creates an additional or supplemental remedy, the pre-existing rights of any party at common law or in equity, and the cognizance of the courts to pass on such rights are not stripped away unless the Legislature has noted its clear and explicit intention to do so. (Matter of Steinway, 159 N. Y. 250, 264; 56 N. Y. Jur., Statutes, § 194.) Translated into concrete terms, that means that this court retains its inherent jurisdiction in law and equity to deal with allegations of fraud, deceit, misrepresentation and breach of fiduciary obligations, irrespective of the statutory requirements. If, however, there are other defects in the offering statement and prospectus which do not.of themselves constitute independent actionable wrongs —■ omissions, indefiniteness, insufficient detail, or inappropriate language — matters which would not be the basis for any action but for the enactment of section 352-e — then the sufficiency of the prospectus is for the Attorney-General in the first instance, with his administrative nonfeasance or malfeasance subject to article 78 review by the courts.
On this basis, I am convinced that my learned colleague, Mr. Justice Lepe, was incorrect on the motion for temporary injunction when, in commenting on the likelihood of plaintiff’s success, he differed from the Attorney-General’s conclusion that the prospectus was adequate, asserting that the prospectus did not meet the requirements of the law in failing to make definitive statements as to the projected cost of capital improvements and operating expenses. I decline to follow that aspect of his decision. Since, on the motion for preliminary injunction, no adjudication on the merits was called for, these observations must be treated as obiter dicta, and not as the law of the case. (Walker Mem. Baptist Church v. Saunders, 285 N. Y. 462; Irvin Agency v. Hess, 176 Misc. 45, affd. 261 App. Div. 935.)
The statutory scheme clearly entrusts to the Attorney-General the responsibility of passing on the sufficiency of the prospectus. If any “ expertise ” is called for in reviewing that prospectus, it is his and not the court’s. The Attorney-General’s office through which every offering statement for a co-operative plan must pass presumably has far greater experience. and more investigative facilities than does the court. The Attorney-General having approved the prospectus for filing, the only appropriate standard by which this court can review the adequacy of the prospectus is the article 78 standard — was the giving of that approval arbitrary and capricious — was it in clear contravention of the requirements of the law.
Among other things contained in the prospectus is an engineer’s report running nine pages, dealing with the condition of *258 the building and setting forth the estimated cost of repairs or replacement. That engineer set forth a total of $568,100 for items requiring present attention and $47,500 for items requiring repairs in the near future — a total of $615,600. The engineer testified that his preliminary figure was lower but that he increased it to $615,600 to account for a rise in prices. Based on that estimate the sponsors nevertheless stated in the prospectus: “ A fund of $648,680 is being provided to the Apartment Corporation out of the funds raised from the sale of shares in order to cover the cost of the recommended repairs and capital improvements and also to provide for an increase in such costs occasioned by rising prices prior to undertaking the work * * * The cost for repairs and capital improvements referred to above are based solely upon estimates by the Engineer and no representation is made as to the adequacy of this fund to pay for all necessary repairs. Any repairs or capital improvements not specifically referred to in and covered by the Report of the Engineer may entail additional expenditures necessitating an increase in maintenance charges or an assessment.”
The prospectus also sets forth a 3-page estimate by Brown, Harris, Stevens, Inc., managing agents, of the operating costs for the first year as a co-operative building. This was estimated to be $431,134.47, which figure included contemplated increases in labor, $28,000 for miscellaneous and repairs and a $19,755.47 reserve for contingencies. This estimate of operating expenses was more than 25% higher than those actually incurred in the preceding three years. Again, in explanatory statements set forth in the prospectus it was stated: 11 Brown, Harris, Stevens, Inc., based upon its experience, believes these estimates to be correct and accurate, but that firm does not represent or warrant that the actual income expenses, maintenance charges or income tax deductions for any period of operation will not vary from the amounts set forth or that the Apartment Corporation will not incur additional expenses or that the Board will not provide for reserves not reflected in such schedules. The amounts estimated may change because of economic conditions, increases or decreases in taxes or wages, required capital expenditures or for other causes.”
My colleague Mr. Justice Leff was of the opinion that this was a disclaimer or exculpatory statement which was inconsistent with the provisions of the law because they did not constitute explicit representations from experts for which they could be held responsible. With this conclusion I whole-heartedly disagree. Section 352-e (subd. 1, par. [b]) specifies the *259 information which must be contained in the prospectus. It provides that a prospectus must clearly distinguish between fact and opinion without omitting any material fact or including any untrue statement. This appears to be precisely what the sponsors have done. While setting forth estimates for capital improvements and operating expenses, they have taken pains to disabuse anyone of the notion that the figures given represent a hard and fast commitment. These are estimates, and they are clearly labeled as such, since no firm factual figures as to the future could be set forth unless already contracted for. Without the limiting language explaining what the figures set forth actually stand for the prospectus would fail to distinguish between fact and opinion, and in setting forth as certain that which must be uncertain would be guilty of serious misstatement.
Apparently this has been the view consistently followed by the Attorney-General, who has promulgated regulations in connection with co-operative apartment offerings. Regulations of the State of New York (13 NYCRR 17.2[b] [2]) calls for: “ (xii) A breakdown of projected maintenance (including labor) charges, including: the projected totals for itemized expenses and the basis thereof (whether based on the figures of the previous owner, promoter’s estimate, etc.) indicating the specific qualifications of all persons making such projections and the basis upon which the projections are made * * *
“ (xvii) A projected statement of income and expenses for the first full year of operation by the co-operative organization with identification of the source of such projection and the basis thereof. If any such figures are expected to change in the following year or years, it shall be so stated ”.
Clearly, the projections which are required for the future can be nothing more than educated estimates. There is expert opinion as to those estimates which is called for with an explanation of the basis for those estimates, and not a warranty by the experts for which they can be held accountable should the actualities of the future be at variance, with their projections.
The cautionary language of the prospectus is in fact required by the Attorney-General as a precondition to acceptance of a ■ plan for filing. Had these statements not appeared in the prospectus, it is most unlikely that the plan ever would have been accepted for filing. The fact that the plan was accepted is an administrative deteraiination-of sufficiency which is to be given great weight by any reviewing court. (1 N. Y. Jur., Administrative Law, § 108; Matter of Rex Textile Co. v. Luther Mfg. Co., 17 Misc 2d 100, affd. 280 App. Div. 884.) The trial testimony indicated that language substantially identical to that in the *260 present prospectus has been used by the attorneys and managing agents in every previously filed offering. It would be shocking to, hold that the very qualifying statements which impart greater veracity to a disclosure statement somehow undermine and invalidate every co-operative offering. It cannot be held that a warranty of specific figures rather than an estimate is called for. If this were so, there would be few experts indeed who would be willing to expose themselves to liability by making a definitive statement as to future capital costs or operating expenses. It is of interest to note that the Architect’s Handbook of Professional Practice (Amer. Inst, of Architects, 1963, ch. 15) cautions that “no estimate furnished by the architect is ‘guaranteed’. It can only be a statement of probable project construction cost since market and competitive conditions are dominant factors during any bidding or negotiation period. Nonetheless the approximation must be as close a one as he can make, or secure within the means reasonably available to him. A growing competence in cost estimating should be the constant goal of every architect. At the same time, the client should be thoroughly briefed on the basis for and limitations of the architect’s estimate.”
Wholly apart from the question of whether the language of limitation contained in the prospectus suffices to invalidate the entire offering, the court finds that the actual figures and projections set forth in the prospectus do not constitute misrepresentations or untrue statements. The estimate of the engineer as to required capital improvements of $615,600 already contained some built-in cushions or reserves and the sponsors set aside an additional $33,000 to be on the safe side. A group of tenants opposed to the co-operative plan retained their own consulting engineer, and he submitted an estimate of the capital improvements required totaling $976,350. It is not entirely amazing that experts could be found with differing views of what is required, with a variation of cost figures of 50%. Given two conflicting engineering reports, how can the court determine which is more likely to be correct. Is it to be based on the demeanor and sincerity of the offering expert or the subjective impression that expert makes on the court?
In the battle of experts should the court not give some presumptive validity to the statement of the expert retained by the tenant sponsors, since those tenants are going to bear the costs, and presumably they do not wish to delude themselves. Then should the court not give weight to the fact that the Attorney-General, who has investigative facilities and independent engineers at his disposal has had the conflicting engineer’s reports *261 before Mm, and has accepted the sponsor’s engineering report except for modifications calling for inclusion of additional items of repairs and replacements not previously covered.
TMs court nevertheless has independently scrutinized the major items of difference in the two engineering reports. The engineer retained by the tenants opposing the plan gave an estimate for replacement of 90% of the building’s windows and 75% of the building’s plumbing fixtures. These two items alone total over half a million dollars. Tenants produced by both sides as witnesses testified, however, that many of the windows, though old, were still serviceable, and similarly that the plumbing fixtures were not actually in need of replacement, except for esthetic reasons. That engineer also reported that the roof and flashings would have to be repaired or replaced. However, the proof in the case showed that the roof had been substantially redone less than two years before and that there was a 7-year guarantee on it. That engineer also estimated it would cost $10,300 to replace sidewalks at approximately $5 per square foot, when the proof showed that the going price was $0.90 to $1.50 per square foot. There were other items included such as the necessity for a standby boiler when a new one had recently been installed, all of which cause the court to regard the report of the opposing engineer with a considerable degree of skepticism. Under all these circumstances, the court concludes that the plaintiff has not sustained the burden of proving any falsity or misrepresentation with respect to the estimates for capital improvements.
The court likewise finds no material falsity or misrepresentation with respect to the estimate of operating expenses. The total contemplated operating expenses for the first year of co-operative operation were projected at $431,134.47, which translated into an average monthly maintenance of $45 a room. Plaintiff took exception to certain of the projected operating expense items in the prospectus — particularly wages, taxes and fuel. The wages set forth in the prospectus included a projected 10% increase for the next year. Actually, labor costs rose 18% to 19%. Taxes are claimed to have been understated by $1,100 and fuel by $3,600. The operating expense statement in the prospectus, however, included a reserve for contingencies of $19,755.47, as well as an item of $27,920 for repairs, supplies and miscellaneous, a figure almost twice that of the previous year, despite the fact that large scale capital improvements would presumably reduce the amount required for repairs. I find that under these circumstances there were more than adequate reserves even if the costs stated were less than they ultimately proved. All prospective purchasers were informed by *262 the caveat in the prospectus that these were estimates subject to further escalation. Even if plaintiff’s experts and not defendants’ were correct, the monthly maintenance charge would increase not more than $2 per room, which in the opinion of the court is not a material difference.
The court concludes there were no material affirmative misstatements in the prospectus. There is a further claim by plaintiff that there were some material items which were not disclosed at all. The principal item of alleged nondisclosure relates to a rider to the proposed purchase-money mortgage which called upon the mortgagor to expend not less than $250,000 within the first three years or have the mortgage reduced accordingly. This provision of the mortgage was not set forth in the prospectus, and undoubtedly it would have been better practice to have done so. Significantly, however, the mortgage itself was before the Attorney-General’s office, and no additional statement was required with respect to this provision. I find that the nondisclosure was not material, since the co-operative plan already contemplated the setting up of a capital improvement-fund of $648,685, well beyond the requirements of the purchase-money mortgage. This fund was computed as part of the total capital to be raised by the sale of shares to tenants. Thus, the mortgage requirement for capital improvements, whether spelled out or not, would not have affected the total price in the least.
Plaintiff produced nine present tenants of the building as witnesses. All objected to the co-operative plan, even though most had signed up for the purchase of shares. During the testimony, however, it became apparent that their objections were based not upon any statements made or omitted in the prospectus, but rather to the underlying idea of the conversion of their apartments from a rental to a co-operative basis. The major objection of some was to the undemocratic aspect of the law which gave 35 % of the tenants the right to override the will of the majority. Others who were elderly, objected to putting a substantial portion of their life savings into a purchase of an apartment for their remaining years. A number objected to the 11 special deal ’ ’ that two of the tenants were getting with respect to the option to purchase additional apartments (of which more below). Still others merely objected that the price was too high. In no instance did I find that there was complete reliance by tenants upon the matters set forth in the prospectus which made the difference in their ultimate decision to purchase or not to purchase. Without reliance, and without a showing that the statements in the prospectus or the omissions from the *263 prospectus were false and known to be false, no case of fraud or deceit is made out.
Plaintiff makes a further argument that wholly apart from the matters contained in the prospectus, the sponsoring tenants owed a fiduciary obligation to all other tenants, and more particularly those who contributed toward the fund to explore the feasibility of setting up a co-operative plan, to keep all tenants fully apprised of the status of the negotiations. As in many similar cases, the actual work of retaining an attorney, an engineer, a managing agent and of negotiating with the landlord for acquisition of the building was left to a small steering committee. While there could have been better communication between the steering committe and the rest of the tenants, they were not obligated to disclose every detail of unconsummated negotiations, and when there was something to report they were obligated to set it forth in the complete detail called for in the prospectus. Since all the details were released to all the tenants in the offering statement of April, 1970, and since it was not shown that anyone changed his or her position during the intervening period, there is no basis for finding that anyone was injured in the least by the breach of any alleged fiduciary duty of-full disclosure prior to issuance of the prospectus.
The final challenge to the plan is plaintiff’s contention that the required number of tenants failed to indicate their acceptance of the plan. There are 147 apartments in the building in addition to the superintendent’s apartment. One hundred forty-four of the apartments to which shares are allocated are rent-controlled, while three penthouse apartments are subject to the New York City Rent Stabilization Law. Section 55 (subd. c, par. [3], subpar. [a]) of the New York City Rent, Eviction and Rehabilitation Regulations provides that no certificate of eviction is to be issued for any apartment unless it can be established that the co-operative corporation has, within six months from the date the co-operative plan was presented, sold at least 35% of the controlled apartments to the tenants who were in occupancy at the time of the presentation of the plan, in good faith, without fraud and deceit, and with no discriminatory repurchase agreement or other discriminatory inducement.
On the date of the presentation of the plan there were 144 controlled housing accommodations- in the building. Fifty-two apartments would constitute 36.11% of that total, 51 apartments would be 35.42%, and 50 apartments would be 34.73%. On August 31, 1970, the sponsoring tenants circulated a list of 52 tenants in the building who had subscribed to the plan, and declared the co-operative plan effective. Plaintiff challenges *264 the propriety of including three of the subscribing tenants, which would bring the total to less than 35%.
Two of the tenants whose inclusion in the 35% has been challenged are Aron Salman and Harry Delson who are alleged to be the beneficiaries of a special inducement. The contract of sale between the co-operative corporation and the building owner required a cash payment of $475,000 on closing, together with estimated closing costs of $50,000. Since it was possible, even if 35% of the tenants subscribed to the plan, that this amount of cash might not be available to the co-operative corporation at the closing date, two individuals, Solomon Salman and Harry Delson agreed to make up the difference between the cash committed by the tenants and the $500,000 which had to be on hand, by purchasing shares at the original offering price, for up to 15 unsold apartments. This arrangement was set forth in complete detail in the prospectus. It is the plaintiff’s contention that this arrangement constituted ‘ ‘ discriminatory inducement ” which rendered them ineligible to be counted.
A “ discriminatory inducement ” under this section is not the equivalent of a special privilege or obligation. To constitute a ‘ ‘ discriminatory inducement ’ ’ it must improperly persuade a tenant, who would not otherwise be willing to purchase his apartment, that he should do so. Thus, if there is a secret understanding that a person indicating a willingness to subscribe would be relieved of his obligation or have his shares taken off his hands once the other tenants have signed up, then his manifestation of assent would not be genuine and he should not properly be counted. On the other hand, a tenant who is fully persuaded and has every intention of subscribing to the co-operative plan in any event cannot be said to have been ‘ ‘ induced ’ ’ by additional or extraneous factors. It appears that the contractual arrangement whereby Messrs. Salman and Delson were to put up' “ standby money” to enable the co-operative corporation to close the contract is an arrangement separate and apart from the purchase of apartments for personal use. They were to convey a benefit to the co-operative corporation and receive in return the possibility of a profit or loss on the sale of apartments other than their own. I do not find that this independent prospect for profit constitutes a discriminatory inducement. Perhaps they cambe called to account in some other proceeding if it can be shown they have improperly profited, but that does not affect the total count of assenting tenants.
Plaintiff’s challenge is watered down even further by the fact that one of those with the option to purchase in exchange for financing is Mr. Solomon Salman, who is not himself a tenant *265 in the building, but is the father of Aron Salman, one of the subscribing tenants. I certainly cannot find that the arrangement for interim financing with his father constituted a discriminatory inducement to the son.
Given this conclusion, it follows that more than 35% of the tenants in the controlled housing accommodations had subscribed to the plan. Consequently, it is not necessary to pass on the question of whether Mr. Jonathan Nahon of apartment 14-K, who was one of the signatories, was a tenant in occupancy on the crucial date.
Inevitably, once 35% had signed up, the stampede began as the other tenants, anxious to protect their homes, also rushed to sign up. Approximately 140 tenants have presently indicated an intention to purchase under the plan even though many of these undoubtedly would not have purchased if the 35% figure had not been reached. It is equally clear that others, including one of the original initiators, would have signed up before the expiration of the six-month period in any event, though not in the first 52. The court understands and sympathizes with the complaint of the resisting tenants that they are being undemoeratieally forced into a course of action they oppose because the law now permits a minority to impose its will upon the rest. That quarrel, however, is for the Legislature and not the courts.
Based upon the foregoing conclusions, this court finds that a valid offering was made for the sale of shares and proprietary leases in a co-operative corporation, that there was no fraud, deceit or misrepresentation, that the plan became fully effective on August 28, 1970. For all the reasons stated above the complaint of the plaintiff is dismissed, and the temporary injunction vacated.