**Joseph J. ASHTON, Plaintiff,**

v.

**THORNLEY REALTY CO., a co-partnership, et al., Defendants.**

**No. 69 Civ. 5630.**

United States District Court,
S. D. New York.

May 1, 1972.

Dublirer, Haydon & Straci, New York City, for plaintiff; Charles Haydon, New York City, of counsel.

Davis, Gilbert, Levine & Schwartz, New York City, for defendant Peteavage; Patricia Hatry, New York City, of counsel.

Bachner, Tally & Mantell, New York City, for defendants Thornley Realty Co., and Dwelling Managers, Inc.

McLaughlin, Stern, Ballen & Miller, New York City, for defendant 215 East 79th Street, Inc.

McKenzie, Cabell, Martin & Greene, New York City, for defendant Douglas Gibbons-Hollyday & Ives, Inc.

LASKER, District Judge.

Joseph Ashton sues for damages and injunctive relief against various alleged fraudulent activities in connection with the offering of shares in a cooperative apartment. Jurisdiction is predicated on various sections of the Securities Act of 1933 and the Securities Exchange Act of 1934. Since any recovery by plaintiff rests upon the validity of his claims under Section 10(b) of the Securities Exchange Act and Rule 10b–5,[1] we limit our analysis to the application of that section and rule. Defendant Petcavage moves, pursuant to Rule 12(b), F.R.Civ. P., to dismiss the complaint on the ground that the court lacks jurisdiction of the subject matter or for summary judgment pursuant to Rule 56. Some of plaintiff's claims are dismissed for lack of jurisdiction, and summary judgment for the defendants is granted as to the remainder.

Ashton was a tenant in occupancy at the time the contested shares in the apartment corporation were offered for sale. Defendant Petcavage is presently in possession of the apartment by virtue of his purchase of 550 shares from the Thornley Realty Co. ("Thornley"), the owner of the premises at the time a pro-spectus was first issued. The remaining defendants participated in preparing a "Plan of Cooperative Organization" of the premises (sometimes referred to as the "Plan" or "prospectus"). Defendant 215 East 79th Street, Inc. ("the apartment corporation") acquired the premises from Thornley and now operates the building as a cooperative apartment building; defendant Dwelling Managers, Inc. ("Dwelling") was the sponsor and selling agent appointed by Thornley; and defendant Douglas Gibbons-Hollyday & Ives, Inc. ("Douglas Gibbons") is the managing agent of the building.

I.

On August 14, 1968, the day the Plan was presented in the form of a prospectus, plaintiff occupied his apartment under a lease expiring September 30, 1969. The Plan allocated 550 shares of the corporation to the apartment at a price of $82.50 per share, or $45,375.00. Ashton, by virtue of his tenancy, was given the right to purchase the shares at a 10% discount at any time within 90 days after presentation (i.e., until November 14, 1968). The Plan further provided that shares allocated to an apartment occupied by tenants who did not purchase by November 14, 1968 would thereafter be offered for sale to the public.

On December 23, 1968, the Plan was amended in certain respects.

Ashton did not exercise his option to purchase the shares within 90 days after presentation (i.e., by November 14, 1968), and accordingly Dwelling offered the shares publicly. On January 2, 1969, Petcavage, who was not a tenant, filled out an application to purchase the

[1]. Rule 10b–5 reads as follows:
Employment of manipulative and deceptive devices.
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a ma-terial fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

shares and signed a purchase agreement secured by a deposit of $5,500. Petcavage stated in a letter, however, that the purchase agreement and application were conditional upon his receiving an opportunity to visit the apartment.

On January 3, 1969, Dwelling wrote Ashton requesting permission for Petcavage to view the apartment and advising Ashton that if he did not consent Dwelling would institute court action to obtain occupancy. The next day Ashton wrote Dwelling stating that he had no objection to showing the apartment, but added, "I have not negated the possibility of purchasing the apartment."

On January 8, 1969, Ashton offered in writing to purchase the shares at the specified price. Negotiations broke down, however, when Dwelling insisted on $100 per share. At the same time Ashton was apparently told that the shares had already been sold to Petcavage.

Meanwhile, although Petcavage was still unable to gain access to Ashton's apartment, he decided to withdraw the condition attached to the January 2nd purchase offer after examining another apartment similar to Ashton's.

On February 18, Dwelling sent Petcavage a proprietary lease for the apartment, which Petcavage signed and returned on February 20th together with a check for $49,500 representing the balance of the purchase price of the shares.

On March 27, 1969, Petcavage received a letter from Douglas Gibbons stating that the closing of title had taken place on March 26, 1969, and that the effective date of his ownership would be April 1st. Petcavage then informed Ashton by letter that title had closed, that Petcavage had become Ashton's lessor, and that Petcavage intended to occupy the apartment no later than September 30, 1969, the date of expiration of Ashton's lease.

On October 2, 1969, Ashton and Petcavage entered into an agreement by which Ashton was to purchase the shares from Petcavage for $85,000, pro-vided the contract would be voided if Ashton failed to secure the consent of the apartment corporation by October 25, 1969, and provided further that Ashton would vacate the apartment by December 31, 1969 if the transaction was not closed for any reason.

The board of directors of the corporation met later in October and disapproved of the transfer from Petcavage to Ashton. The board and Petcavage then requested Ashton to vacate the apartment. However, Ashton refused and instituted this action on December 29, 1969. On January 5, 1970, Petcavage instituted a holdover proceeding in Civil Court, New York County, to evict plaintiff. On October 28, 1971, the Civil Court ordered that plaintiff vacate his apartment.

## II.

Ashton's first cause of action alleges that the prospectus contained misstatements and omissions of material facts in violation of Section 10(b) of the Securities Exchange Act (and Rule 10b–5) which caused him not to exercise his right to purchase during the 90 day period.

The claimed misrepresentations are: (1) that the Plan omitted to state that after the 90 day option period the tenants had no absolute right to purchase at the full listed price without discount; (2) that no information was set forth as the basis for the allocation of the shares of stock to the respective apartments; (3) that the Plan did not contain a description of the major, current leases on the apartments; (4) that the Plan did not state the business backgrounds of the principals involved; (5) that the Plan concealed the extent and nature of the financial interest of each of the principals; and (6) that the Plan concealed the interests and profits made by Thornley and Dwelling in the promotion and management of the venture.

The remaining allegations in the first cause of action are unrelated to the contents of the Plan. Ashton asserts that the defendants illegally conspired to pre-

vent him from purchasing shares in the cooperative. He claims that, in reliance upon Dwelling's fraudulent assertion that he was obliged to show his apartment to prospective buyers, he accepted the then outstanding offer on January 8, 1969. In furtherance of the conspiracy, Ashton claims that the defendants "refused to receive his payment and to recognize his acceptance of their offer" and demanded $100 per share rather than $82.50.

It is also alleged that Petcavage entered the conspiracy with knowledge of its purposes and permitted the other defendants to "use him" as a purchaser of the shares allocated to Ashton's apartment. As a result, Ashton claims, he entered into the agreement to purchase the shares directly from Petcavage and that the other defendants insisted that the agreement contain a clause stating that the transfer would be ineffective without the consent of the board of directors. Finally, Ashton contends that the defendants prevailed upon the board "arbitrarily and capriciously" to refrain from approving the transfer.

As his second cause of action, Ashton claims that the amendment dated December 23, 1968 created an additional 90 day period during which the tenants had the exclusive right to purchase, and that therefore the apartment corporation was obligated to sell him the shares on January 8, 1969, at $82.50 per share.

As his third cause of action, Ashton alleges that the acts and omissions of defendants constitute a violation of Article 23–A (§ 352 et seq.) of the General Business Law of New York, McKinney's Consol.Laws, c. 20, by omitting certain required pertinent information from the prospectus.

### III.

We note at the outset that all claims (including those pertaining to the conspiracy) alleged to have arisen after the November 14, 1968 cut-off date are jurisdictionally defective. Our disposition of these "post-90 day" claims is dictated by the holding in Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963 (2d Cir. 1969), cert. denied 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970). There the Court of Appeals reaffirmed the vitality of the rule first enunciated in Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), which requires that an action under Section 10(b) be maintained by a purchaser or seller of securities. Iroquois, supra, 417 F.2d at 965. In Iroquois, the plaintiff sought to acquire control of Syracuse through the means of a tender offer. The defendants, various officers of Syracuse, induced its stockholders not to tender their shares through the use of various false and misleading activities and statements. In finding that plaintiff had no standing to sue under the Securities Act, the court said:

> "Iroquois is not here complaining that it was misled by the acts of defendants as to any purchases or sales by it of Syracuse China stock; indeed, its basic complaint is that, because of the acts of defendants, it could not purchase such shares." Iroquois, supra, 417 F.2d at 967.

After the 90 day option period, Ashton stands in no better position than Iroquois. As an aborted prospective purchaser, he fails to attain the required status of a purchaser. See also Keers & Co. v. American Steel & Pump Corp., 234 F.Supp. 201 (S.D.N.Y. 1964); Hirsh v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 311 F.Supp. 1283 (D.C. 1970). But cf. Commerce Reporting Co. v. Puretec, Inc., 290 F.Supp. 715 (S.D. N.Y.1968). Ashton points out, however, that the Securities Exchange Act of 1934 defines the terms "buy" and "purchase" as "any contract to buy, purchase, or otherwise acquire."[2] While it

---

**2.** 15 U.S.C. § 78c(a) (13) (1964), Securities Exchange Act § 3(a) (13), pro-

vides: "The terms 'buy' and 'purchase' each include any contract to buy, pur-

is true that Ashton would satisfy the purchaser-seller requirement if he demonstrated that there was a "contract to buy" the shares in the cooperative, he has produced no proof that such a contract was ever consummated.

Putting aside the question whether the complaint even fails to *allege* a "contract to buy," it is difficult to see how Ashton can assert that in January of 1969 he had entered into a contract to purchase the shares for $82.50 when no such offer then remained outstanding to him. The prospectus stated: "In the event that any occupant should fail to purchase the shares allocated to the apartment during the 90 day period set forth, the shares will then be offered for sale to third parties." (at pp. 2–3). Furthermore, contrary to Ashton's assertion, $82.50 was not the price obtaining during the period commencing after the expiration of the 90 day period. Rather, the Plan stated that the corporation reserved the right to change the price after November 14, 1968. This being the case, plaintiff's acceptance of the $82.50 "offer" was, in fact, no acceptance at all, but, at most, an offer on

his part or an indication of an intention to negotiate.

Finally, if a contract to purchase the shares had been entered into, presumably the parties would have signed the standard "Purchase Agreements" which were attached to the prospectuses. Such was not the case, however.

Neither does the private agreement between Ashton and Petcavage to transfer the shares to Ashton constitute a "contract to buy," The Plan, the purchase agreement between Ashton and Percavage, and the proprietary lease all required that any transfer of the shares of the apartment corporation be approved by the board, and it was clear that without such approval the agreement would not bind anyone.

## IV.

We come, then, to those 10(b) claims alleged to have occurred *during* the 90 day period.[3] We assume arguendo that these claims are not jurisdictionally defective, and proceed to the merits, although the jurisdictional question is by no means free of doubt.[4]

---

chase, or otherwise acquire." 15 U.S.C. § 78c(a) (14) (1964), Securities Exchange Act § 3(a) (14), provides: "The terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of."

3. Ashton's second cause of action, which alleges that the 90 day discount period was extended because of "material alterations" and that (1) in his ignorance that the Plan was amended he "made a deal" with the owners on January 8, 1969, and (2) had he known that the Plan was so altered he would have claimed that the Plan constituted a new offering and that therefore he was entitled to an additional 90 days, is utterly without merit. First, as stated above, no contract was ever made. Second, nowhere in the regulations promulgated by the Attorney General (Regulations of the State of New York, Title 13, Chapter II, part 17), is there a requirement that cooperative corporations grant tenants an additional 90 days to purchase their apartments after a Plan is amended. Nor did the Attorney General, who passed upon the sufficiency of the amendment, impose any such require-

ment. Finally, the alterations (i. e., an increase in authorized shares from 26,-845 to 30,000, an increase in working capital from $30,000 to $32,500, and a commitment by the sponsors to make certain repairs) can hardly be called "material"—so that they would have influenced a tenant's judgment as to whether to purchase a proprietary lease. See Complaint, para. 27. Indeed, the changes would seem to have made the purchase more desirable rather than less so.

4. We think the fact that Ashton had an irrevocable right, presumably specifically enforceable, to buy shares of the cooperative for a period of 90 days placed him (during the 90 day period) in a status beyond that of a mere aborted purchaser, *cf.* Iroquois Industries v. Syracuse China Corp., supra, and that his enforceable option to purchase the shares may well constitute a "contract to buy" for the purposes of § 10(b) liability. See A. T. Brod & Co. v. Perlow, 375 F.2d 393 (2d Cir. 1967); SEC v. Texas Gulf Sulphur Co., 258 F.Supp. 262 (S.D.N.Y.1966).

Turning to the prospectus' alleged omissions and misstatements, Ashton's contention that the Plan was misleading because it did not state that the tenant had no absolute right to purchase at the listed price without discount after the 90 day period, and that Ashton relied on an "apparent right" of first refusal, is without merit. It is a novel enough theory that a prospectus might specify all rights which a prospective purchaser does *not* have; but it would approach the absurd to require that a prospectus detail the negative not only of all legal rights, but of "apparent rights" . . . "derived from understandings in the community," as Ashton puts it. Furthermore, the Plan stated quite unambiguously:

"Each tenant in occupancy who signs and delivers to Sponsor a Purchase Agreement during the 90 day period above mentioned shall also have the right to purchase the shares allocated to his apartment at a price of 10% less than the cash purchase price set forth in Schedule D." (Plan, p. 3).

It further provided:

"In the event that any occupant should fail to purchase the shares allocated to the apartment during the 90 day period set forth, the shares will then be offered for sale to third parties." (Plan, p. 2).

No reasonable man could have read these provisions and concluded that the discount provisions applied after the 90 day period. The whole purpose of the 90 day period was to confer upon a tenant in possession a discount price if he acted expeditiously.

Ashton's semantic argument that the Plan stated that it would describe the rental values, whereas in fact no such information was given, is equally without merit. The Plan stated:

"Shares of stock of the Cooperative Corporation have been allocated by the Sponsor to each of the residential apartments in proportion to their rental value and details with respect thereto are set forth on Schedule D." (Plan, p. 2).

Apparently Ashton construes the word "thereto" as referring to the rental value of the apartments rather than to the shares and their allocation. We do not agree with Ashton's interpretation, since it would appear that "thereto" refers to the allocation of the shares. But in any event, Ashton could not have relied to his detriment on such a construction because all he had to do to determine whether he was correct or not was to turn to Schedule D of the Plan, which described the allocation of shares. Furthermore, Schedule D provided all the details that New York law requires of such a plan.[5] Neither the General Business Law nor the regulations require setting forth the rental values upon which the allocation of shares is made.

The remaining 10(b) claims are derived from alleged failures to comply with Article 23–A of the General Business Law of New York, Ashton's theory apparently being that a failure to comply with the disclosure requirements of New York law makes out a prima facie 10(b) claim under the Securities Law.[6]

Ashton complains that the Plan (1) did not provide "a description of major current leases;" (2) the "business background of the principals involved;" (3) the "nature of [the principals'] . . . financial relationship . . . ;" (4) the "interests and profits of the promoters, offerors, . . . in the promotion and management of the

---

5. Regulations of the State of New York, Title 13, Chapter II, § 17.2(3) (2) (viii), read:

A separate schedule including: identification of each apartment; number of rooms and baths in each; the allocation of shares; the stock price per apartment; the estimated annual expense and maintenance per share, per apartment and per the total of all apartments.

6. Since Ashton's third cause of action alleges the same violations of Article 23–A of the General Business Law of New York, it is unnecessary to consider this cause of action separately.

venture." (§ 352–e, subd. 1(b) of Article 23–A of the New York General Business Law).

 First, it should be observed that the Attorney General, who is vested with exclusive jurisdiction to pass upon the sufficiency of the material required to be set forth in a prospectus, and who is empowered to apply to the Supreme Court for an injunction against any person violating these provisions (§§ 352–i, 353), or to ask for the appointment of a receiver (§ 353–a), or is empowered to initiate criminal prosecution (§ 358), approved the Plan. While we are not bound by the determination of the Attorney General, we think deference should be given his investigative expertise in these matters. See Schumann v. 250 Tenants Corp., 65 Misc.2d 253, 317 N.Y.S.2d 500, 505–506 (1970).

Second, we conclude from our own examination of the Plan that the New York statute was sufficiently complied with and that therefore, on the theory predicated by Ashton, no 10(b) or 10b–5 claims are stated. With respect to the requirement that the leases be described, while the prospectus did not detail the rental, term and expiration date of all existing leases in the apartment building, it did state that every prospective purchase would be given such information in connection with the Purchase Agreement. Further, the purpose of such a requirement appears to be to protect third party purchasers who would otherwise be uninformed as to the rights of a tenant. Ashton was not such an outsider, and, since he was aware of the lease on his own apartment, he could not have relied to his detriment on the alleged omissions. As to the remaining alleged omissions, we have carefully examined the detailed material submitted and find that the information supplied under the headings "FINANCIAL PLAN" and "OWNER, SPONSOR AND MANAGEMENT" complies with the requirements of Article 23–A of the General Business Law.

Finally, we note that, except with respect to his allegation of an "apparent right" of first refusal, Ashton has submitted no probative evidence of reliance by him to his detriment on the alleged omissions.

Accordingly, defendant Petcavage's motion to dismiss the complaint for want of subject matter jurisdiction is granted as to those claims arising after the 90 day period. The motion for summary judgment is granted as to those claims arising during the 90 day period.

It is so ordered.